175 So.2d 326 (1965)
Charles X. MILLER
v.
HOUSING AUTHORITY OF NEW ORLEANS et al.
No. 1761.
Court of Appeal of Louisiana, Fourth Circuit.
May 3, 1965.
Rehearing Denied June 7, 1965.
*328 Edgar Corey, New Orleans, for Charles X. Miller, plaintiff-appellant.
Guste, Barnett & Little, William J. Guste, Jr., John Pat. Little, James M. Colomb, Jr., Roy F. Guste, Robert A. Keily, New Orleans, for Housing Authority of New Orleans, defendant-appellee.
Sessions, Fishman, Rosenson & Snellings, Cicero C. Sessions, New Orleans, for Maryland Cas. Co., appellee and third-party defendant, third-party plaintiff, plaintiff and defendant in reconvention.
Deutsch, Kerrigan & Stiles, R. Emmett Kerrigan, Malcolm W. Monroe, New Orleans, for Pittman Const. Co. and its sureties, defendants, plaintiffs in reconvention, third-party plaintiffs, etc., and appellants-appellees.
Before REGAN, SAMUEL and HALL, JJ.
REGAN, Judge.
The plaintiff, Charles X. Miller, a subcontractor, instituted this suit against the defendants, Pittman Construction Company, the general contractor, which is a partnership composed of Theodore A. Pittman and Albert E. Pittman, the partners individually, and their sureties, namely, the Continental Casualty Company, the Massachusetts Bonding and Insurance Company, American Automobile Insurance Company, the New Amsterdam Casualty Company, and also against the owner, the Housing Authority of New Orleans, endeavoring to recover the sum of $73,652.48, representing a 10% retainage of the contract which the plaintiff asserts is due for lathing and plastering work executed by him as a subcontractor in the Desire Street Housing Project, together with various charges for extra work performed by him beyond the scope of the plans and specifications.
The Pittmans[1] and their sureties answered and denied that any amount was due Miller; in the alternative they insist that the aggregate amount due to the plaintiff is $41,001.52, after deducting the backcharges for work performed for Miller, the equipment and materials furnished to him, and the progress payments made to him.
Pittman further answered and asserted that Miller is not entitled to receive even the amount set forth hereinabove (1) since the Housing Authority of New Orleans has not yet paid the balance due Pittman under the prime contract, (2) because liens for $5,408.68 and $4,139.28 were filed by J. J. Clarke Company, Inc., and Schwartz Supply Company, Inc., respectively, (3) because a levy was served on Pittman by the United States of America for withholding taxes owed by Miller, and finally (4) because Pittman and its sureties have incurred premiums of $120.00 and $1,800.00 to cancel the liens recorded by Schwartz and Miller, respectively, together with attorney's fees of $4,500.00 resulting from the claims of the various materialmen, the United States of America, and Miller.
Predicated on the legal implications of the foregoing answer, Pittman and its sureties then reconvened against Miller for back-charges, premiums, and attorney's fees incurred by them, and for any other amounts for which they may be ultimately liable to the lien claimants.
Pittman and its sureties, out of an abundance of caution, also filed a third party petition against the Maryland Casualty Company, who was Miller's surety on one of the two subcontracts, endeavoring to preserve their right to recover from the surety the back-charges, expenses, and other liabilities to which they may be exposed which arose out of the bonded subcontract.
Maryland Casualty Company then answered the foregoing petition and denied that the amount sought to be recovered arose out of the contract on which it was surety, and in turn, to protect itself, sued *329 Miller and his wife as indemnitors on the bond for any amount it may be ultimately obligated to pay, including attorney's fees and costs of court.
Pittman and its sureties also filed a third party petition against the Housing Authority of New Orleans, asserting that if they should be adjudged liable for Miller's claim for additional compensation or for the balance of the amount owed under the subcontract, the Housing Authority of New Orleans should, in that event, be liable to Pittman under the prime contract.
The lower court rendered judgment in favor of Miller against Pittman and its sureties for $41,001.52, less the following amounts: (1) a sum adequate to pay the levy of the United States of America against Pittman for withholding taxes, penalties, and interest owed by him; (2) an amount sufficient to satisfy the judgment rendered in favor of August A. Weggmann, Receiver of J. J. Clarke Company, Inc., ($5,408.68); and (3) the sum of $4,139.28, necessary to liquidate the lien of Schwartz Supply Company, Inc.
In addition thereto, judgment was rendered in favor of Pittman and its sureties against Miller and Maryland Casualty Company for any deficiency which may result between (a) the gross amount payable to Miller and (b) the total of the levy by the United States together with the aforesaid materialmen's liens.
Judgment was also rendered in favor of Maryland Casualty Company against Miller and his wife in the amount of $1,500.00, representing an attorney's fee and for any further amount which Maryland may be required to pay as a result of the decree.
Finally, all demands against the Housing Authority of New Orleans were dismissed.
From the foregoing judgment, Pittman and Mr. and Mrs. Charles X. Miller have prosecuted this appeal. Maryland Casualty Company has answered the appeals, in an endeavor to modify the judgment of the lower court in several respects which shall be discussed in the sequence of this opinion.
This case was consolidated with a suit by J. J. Clarke and Company, Inc., in order to facilitate and expedite the trial thereof. The suit referred to is entitled, "J. J. Clarke Company, Inc. v. The Housing Authority of New Orleans, et al.", 175 So.2d 337. In the Clarke case, the plaintiff instituted suit against the Housing Authority of New Orleans and against Pittman and its sureties in order to satisfy its claim for materials furnished Miller which were used in the Housing Project by him.
In this consolidated suit, Pittman and its sureties filed a third party petition against Miller and his surety for any amount which it may be required to pay Clarke emanating from their vicarious liability under the Public Works Statute.
The consolidated suit originated in another division of the lower court. Clarke moved therein against Pittman for a summary judgment, which was granted. A motion for summary judgment by Pittman against Miller was severed from the Clarke proceeding against Pittman, and it, together with all other such claims, for obvious legal reasons, was consolidated with this suit by Miller against Pittman, its sureties, and the Housing Authority of New Orleans.
The record, despite the foregoing procedural gymnastics, reveals that on March 19, 1953, the plaintiff, who is a plastering contractor, executed two subcontracts with the defendant, who was the general contractor employed by the Housing Authority of New Orleans to construct the Desire Street Housing Project. The combined price of the two contracts for the lathing and plastering work amounted to the sum of $411,000.00; however, the plaintiff was able, financially, to secure a performance bond for only $260,000.00. He accordingly requested Pittman to divide the work. Hence, a bonded contract was entered into for $260,000.00, with the Maryland Casualty Company acting as his surety. An unbonded *330 contract was then executed between the parties in the amount of $151,000.00.
The general contract provided for a 10% retainage of the total contract price by the owner, the Housing Authority of New Orleans, from Pittman, the general contractor, in the event the Project was not accepted. The subcontracts reveal the existence of similar provisions between Pittman and Miller.
The subcontracts stipulated that Miller was to plaster 81 multi-unit buildings in the Project. Miller completed the plastering work on or about November 1, 1954, and it was accepted on January 1, 1955. Except for three buildings, the unbonded contract was performed before the work ensued under the bonded contract.
Pittman's work on the Project as general contractor was not accepted,[2] and the Housing Authority of New Orleans refused to pay Pittman the 10% retainage under the prime contract. An agonizing legal duel resulted,[3] and consequently Pittman refused to pay plaintiff the 10% retainage due on the plastering subcontracts.
The record unequivocally reveals that the only plausible reason for Pittman's nonpayment of the 10% retainage due to Miller was the fact that the Housing Authority of New Orleans refused to pay Pittman the 10% retainage on the prime contract. The record also denotes that Pittman charged the Housing Authority of New Orleans $427,930.00 for the lathing and plastering work, and of this amount Pittman has received $385,137.00. However, Miller has only been paid $368,294.00, or $16,843.00 less than Pittman has received for the plastering work performed in the Project.
Pittman initially contends that Miller is not entitled to recover the net retainage due under their contract because of certain breaches thereof by Miller which occurred when he failed to pay for all labor and materials used in the Project. Specifically, Pittman asserts that Miller is not entitled to the net retainage since he neglected to pay for the materials which provoked the Schwartz and Clarke liens and the withholding taxes, which provoked the levy by the United States of America, and concludes therefrom that the lower court erred in rendering judgment in favor of Miller for the balance owed to him by Pittman.
The judgment of the lower court, to reiterate, awarded Miller the net retainage, minus a sum of money sufficient to satisfy the liens of the United States, Schwartz, and Clarke. In addition thereto, a judgment was explicitly rendered in favor of Pittman and its sureties against Miller for any deficiency which may result if the total amounts of the three liens should exceed the money due Miller.
It is conceded that the nebulous balance due Miller, as we have said, is $41,001.52, subject to certain deductions claimed by Pittman which, of course, are disputed by Miller.[4]
The mere fact that Miller did not pay for all labor and materials used in the Project does not preclude him from recovering what is due him, subject, of course, to a deduction for what he may owe Pittman.[5] In view of the fact that the amount of the levy of the United States is constantly increasing because of the accumulation of interest, it was impractical for the lower court to render a judgment for a fixed dollar amount. In any event, the judgment recognized that certain sums were due to Pittman, and therefore he cannot with any validity assert that the ruling of *331 the lower court, in this respect, was prejudicial to his interests herein.[6]
However, Pittman points out that the lower court erred in not providing in the judgment that his payment to Miller for retainage and interest be conditioned upon the receipt by Pittman of the money owed to it by the Housing Authority.
In a previous suit, the opinion of which emanated from this court, the Housing Authority was ordered to pay Pittman all amounts due it under the prime contract.[7] However, it was conceded by all of the litigants herein that the judgment, unfortunately, had not yet been satisfied by the Housing Authority when this case was submitted to us.
Pittman predicates the validity of the foregoing argument upon a provision appearing in Article XI of the subcontracts, which reads:
"Progress payments will be made to Miller, based on monthly estimates approved by the Contractor, `within 10 days after receipt of payment from the Owner * * *, less 10 per cent of each estimate to be retained until final payment which shall be made within 10 days after completion of the work included in this contract and written acceptance by the Architect and full payment therefor by the Owner, provided evidence has been furnished by the Subcontractor, if requested, that all claims for labor and materials are settled, and provided further that all the provisions of the contract have been complied with to the satisfaction of the Contractor.'"
An analysis of the foregoing contractual provision reveals that it imposes an obligation of making final payment on the subcontract within 10 days after (1) completion of the work, (2) acceptance by the architect, and (3) full payment for the work by the owner. The contract is not ambiguous and its simple effect is to make payment by the owner to the prime contractor a suspensive condition to the prime contractor's obligation to make payment to its subcontractor.[8]
This provision was obviously intended to prevent the prime contractor from being compelled to assume the obligation of financing the construction of the Project in the event of default by the owner. Therefore, we must give effect to the clear intention of the parties as agreed to, and we, as usual, refrain from placing the contract upon the judicial anvil and hammering it into an unexpected shape. Consequently, the judgment of the lower court must be amended to make any payment due thereunder by Pittman to Miller conditioned upon receipt by Pittman from the Housing Authority of payment for the work performed by Miller. In view of the foregoing conclusion, interest shall only begin to run in favor of Miller ten days after the Housing Authority has made final payment to Pittman.
Pittman further contends that the lower court erred in not rendering judgment in its favor for $120.00 expended for bond premiums to cancel the Schwartz lien, $1,800.00 for bond premiums to cancel the lien filed by Miller, and attorney's fees of $4,500.00 which it relates were incurred as a necessary result of the claims of the materialmen and of the United States of America.
*332 On March 31, 1955, Miller recorded a lien for $42,500.00 for the unpaid balance emanating from the subcontracts, $10,752.48 for extra work expended in plastering around beams in the open ceiling areas of the first floors of the buildings, and $10,000.00 representing an extra cost to him which resulted from being required to use certain types of cornerbeads and cornerites other than those submitted by him to the Housing Authority for approval. Since Miller possessed the right to record a lien for the unpaid balance due him under the subcontracts, we are convinced that any bond premiums incurred by Pittman to remove this lien from the public records is not recoverable. On the other hand, we are of the opinion, as was the trial judge, that Miller is not entitled to any additional compensation for extra work or materials used by him in the Project. However, we shall discuss this aspect of the case in its judicial sequence. Therefore, the bond premium expended to remove that portion of the lien representing $10,752.48 for additional plastering and $10,000.00 for the extra cost of the required cornerbeads and cornerites should be awarded to Pittman as damages, in as much as the cost thereof resulted from the wrongful action of Miller in recording liens for these amounts.[9]
In its brief, Pittman argues that it expended $1,800.00 to bond the lien recorded by Miller. This amount equals approximately 3% of the lien bond. While the record is some what nebulous as to whether the premium was 2% or 3% of the amount of the bond, the documentary evidence offered therein indicates that 3% is probably the correct figure. Therefore, we conclude that the judgment of the lower court should be amended by awarding Pittman an additional $622.57, representing the premium of 3% of $20,752.48, the unjustified portion of the lien recorded by Miller.
Pittman insists that judgment should have been rendered in its favor for $120.00, representing the cost of the premium expended by it to remove the Schwartz lien from the public records. This lien was recorded by Schwartz in order to preserve its right to recover for materials supplied to Miller and used by him in the Project. Since the subcontracts stipulated that Miller was to pay for all labor and materials used by him,[10] and to turn the work over free and clear from all claims, encumbrances, and liens for labor or materials, it is clear to us that Miller is liable for any cost incurred by Pittman in removing the lien. Therefore, the lower court's judgment shall be amended by increasing the amount thereof in favor of Pittman to the sum of $120.00
Pittman also requests an award of $4,500.00, representing attorney's fees incurred in connection with the Schwartz and Clarke liens, and the withholding tax levy by the United States. It is well settled that attorney's fees are not recoverable in the absence of some specific statutory or contractual provision.[11] Consequently, we are of the opinion that Pittman's request for attorney's fees is unjustified, since it is not supported by either contractual or statutory authority therefor.
Pittman finally argues that the lower court erred in assessing Miller's cost against it and its sureties instead of against the Housing Authority. Pittman's theory is that the Housing Authority by, virtue of its failure to pay the retainage which was ordered by this court in the litigation referred to elsewhere herein, has prevented Pittman from making the necessary payments to Miller.
In conformity with the rationale emanating from Article 2164 of the LSA-Code of Civil Procedure, an appellate court *333 may tax the costs of the lower or of this court, or any part thereof, against any litigant involved in the suit as in its judgment may be equitable. The exercise of this judicial discretion is permitted and exists by virtue of the statutory law and jurisprudence of this state, and it is now rather well established.[12]
In the exercise thereof, we have considered the fact that each party involved herein, to some degree, has been responsible for the provocation of this litigation, with the exception of the Maryland Casualty Company. Therefore, we deem it most equitable to condemn each party, including the Housting Authority, to pay its own cost incurred herein.
Turning our attention now to the specification of errors pointed out to us by Miller, we notice that he initially contends that the lower court erred by disallowing his claim for extra work performed under the subcontracts. The contracts provided in part that no alterations or changes shall be made except upon the written order of the contractor. Miller insists that this provision does not apply to the work performed by him, since this work constituted "extras" and therefore was not encompassed by this clause.[13]
Miller specifically insists that he is entitled to compensation for work performed in plastering certain beams which were required over all openings more than three feet in width, for installation of cement plaster instead of gypsum plaster in the stairwells of the buildings, removing and replastering rust spots caused by cornerites which were approved by the Housing Authority, and the extra cost of a higher grade of cornerite and cornerbead required by the Housing Authority.
In evaluating Miller's claim for extra compensation in plastering the sides of the beams required over openings more than three feet in width, the lower court pointed out that a sample building was constructed by Pittman with the trusses enclosed in the ceiling. However, on the advice of its architects, the Housing Authority rejected this type of construction and required Pittman to erect a truss below ceiling level or a solid beam in lieu thereof. The drawings offered in evidence did not reflect whether the trusses were to be exposed or concealed. However, the testimony of the supervising architect revealed that there would have been an exposed portion of the framing, which consequently would have to be plastered. Hence, the lower court found, and we agree thereto, that there would have been no difference in the cost of plastering over an exposed truss or over an exposed beam.
Relative to Miller's claim for the extra cost of portland cement in lieu of gypsum plaster used in the stairwells, the lower court chose to accept the testimony of the Housing Authority's representative to the effect that Miller was not requested to use the portland cement. In support of this finding, the lower court pointed out that no written change order, as required by the contract, was ever executed by the Authority or received by Miller.
In rejecting Miller's claim for extra compensation in repairing damage to the plaster caused from the rusting of the cornerite and cornerbead, the lower court concluded that Miller's performance with respect to the rust spots was not consonant with his obligation to perform the plastering in a workman-like manner.
Finally, Miller's claim for extra compensation emanating from the use of a *334 more expensive quality of cornerite and cornerbead than he submitted for approval is predicated upon a nebulous claim of discrimination by the Housing Authority. Miller endeavored to prove that the quality cornerite and cornerbead submitted by him was approved for another section of the same housing project, but that he was not allowed to use it in the section allotted to him under the subcontracts. However, the court excluded all evidence pertaining to the other section of the project. Moreover, the lower court also pointed out that the quality of cornerite and cornerbead which Miller was required to use was spelled out in the plans and specifications.
The foregoing elucidation with respect to Miller's claim for extra compensation reveals that only questions of fact were posed for the trial court's consideration. The judge thereof obviously rejected Miller's version of the facts and as a result thereof, concluded that he was not entitled to extra compensation.
Therefore, the only question which this appeal has posed for our consideration relative to Miller's claims for extras is whether that finding of the trial judge was so erroneous and unsupported by the evidence as to warrant a reversal by us.
We are of the opinion that no useful purpose would be served by indulging in a protracted discussion of the foregoing testimony or by endeavoring to reconcile the respective litigants' version of the day-to-day negotiations and dealings with respect to the matters set forth by Miller. The trial judge accepted the defendant's version thereof, and our analysis of the record convinces us that the evidence preponderates in its favor.
Miller also argues that the lower court's judgment is erroneous since it recognized the claim which the United States of America recorded in the mortgage office against Pittman even though the Federal Government was not a party hereto. Suffice it to say that Pittman has proved the existence of the Federal levy for withholding taxes by a preponderance of the evidence, and Miller does not deny either its existence or the validity thereof. Therefore, Pittman is entitled to a credit for the amount of the levy in conformity with the doctrine of compensation,[14] and it is no more essential that the Federal Government be an actual party to this suit than any other claimant whose lien was recorded.
Miller insists that since the United States of America was not a party hereto, the lower court erred in ordering that the amount of the levy be deposited in the registry of the court. However, since it was decided that Miller was obligated to reimburse Pittman for the amount of the government levy for unpaid withholding taxes, any disposition of such sum is, as a practical matter, of no interest to Miller and he possesses no legal status so as to successfully challenge the lower court's order to deposit this amount in the registry thereof.
Miller finally contends that the "back charges" made by Pittman were not proved by competent evidence. These amounted to $72.00 for lumber, $108.00 for rental of a mortar-mixer, $98.48 for clean-up work, $9.88 for omitting to reinstall two windows, $20.00 for the cost of a window, and $1,395.30 which was also for clean-up work. Suffice it to say that the record reveals that Miller was informed each time a "back charge" was made, and he accepted checks from Pittman, without protest, from which the amounts of these charges were deducted. He obviously conceded then that these "back charges" were due and owing, since no objection of any sort emanated from him at the unsuspicious time that they occurred; therefore, we conclude that the foregoing contention resulted from an afterthought, and consequently it is without merit.
*335 Turning our attention now to the contentions of the Maryland Casualty Company, it argues herein that its obligation as surety for Miller was extinguished in conformity with the rationale of LSA-Civil Code Article 3063,[15] when Miller and Pittman agreed that the work under the unbonded contract would be performed first. In effect, Maryland Casualty Company asserts that by performing the unbonded contract first, the terms of the bond were prolonged to its prejudice.
Maryland Casualty Company introduced evidence in an effort to prove that it informed Miller that it would initially execute a bond for $260,000.00 and thereafter execute another bond for the remaining $151,000.00 upon the satisfactory completion of 80% of the bonded work. Maryland's agent testified that he assumed that the bonded work would be performed first. However, there is no written provision in the bond stipulating that the bonded work was to be performed before the unbonded work.
Therefore, we are of the opinion that Maryland Casualty Company was not released from its suretyship obligation by virtue of Miller's prior performance of the unbonded contract. Article 3039 of the LSA-Civil Code reads:
"Suretyship can not be presumed; it ought to by expressed, and is to be restrained within the limits intended by the contract."
Since a suretyship contract must be in writing,[16] and strictly construed,[17] it is clear that any verbal agreement or understanding which may have occurred between Miller and Maryland Casualty Company is of no significance. Therefore, a verbal agreement cannot be used to defeat the rights of interested parties who acted in reliance upon the written conditions of the bond.
Maryland Casualty Company also insists that the lower court erred by casting it in judgment together with Miller for any balance remaining after deducting the tax levy filed by the United States from any amounts due and owing to Miller. Maryland Casualty Company asserts that it is not liable for these tax claims and therefore cannot be cast in judgment therefor. Throughout its brief, Maryland designates the levy as an "income tax claim" and argues therefrom that it is not responsible for tax claims by virtue of its bond. It appears, in this instance, that the simple difference of semantics has endeavored to rear its confusing head. However, the Federal levy was for withholding taxes deducted from the salaries of Miller's employees, and these taxes were never forwarded to the Federal Government in conformity with the law relating thereto.
Part of the obligation assumed by Miller was to perform the contract and deliver the premises free and clear of all liens and privileges. For this reason, Maryland Casualty Company furnished a performance and lien bond guaranteeing Miller's obligations. It is obvious that Miller's failure to forward taxes withheld from his employees to the Federal Government, thereby resulting in the filing of a tax levy, was in derogation of his legal obligation to execute the contract and deliver the property free of any liens. Therefore, Maryland Casualty Company, as Miller's surety, is solidarily liable with him for the amount of this lien, and the lower court did not err in casting it in judgment for the balance remaining after deducting the amount of the Federal levy.
*336 Maryland also argues that the lower court erred in omitting to render judgment in its favor against Mr. and Mrs. Miller in solido in conformity with the terms of their indemnity agreement in the amount of $249.45, representing its proved expenses.
In support of the foregoing contention, Maryland refers to the indemnity agreement signed by Mr. and Mrs. Miller as part of the application for the bond, which provides that they shall be liable for court costs, expenses, and attorney's fees in the event that the company should be required to enforce the terms thereof. Counsel for Maryland introduced into evidence an itemized list of expenses and court costs incurred by him in its behalf, the total of which was $249.45. This evidence was not successfully contradicted. Therefore, the judgment of the lower court will be amended by rendering judgment in favor of Maryland Casualty Company and against Mr. and Mrs. Miller in the amount of $249.45.
Finally, Maryland complains that the lower court erred by merely rendering judgment in its favor in the amount of $1,500.00 against Mr. and Mrs. Miller for attorney's fees under its contract of indemnification with them. We have re-examined the record in order to carefully evaluate this contention, and as a result thereof, we are convinced that the lower court's award was quite adequate and should not be raised to the sum of $5,000.00 as insisted upon by Maryland's counsel.
In conclusion, it will be recalled that Miller's suit made the Housing Authority of New Orleans, the owner of the Project, a party defendant herein, and in connection therewith asserted that certain sums of money were due him by this defendant on account of the work which he performed as a plastering subcontractor for the prime contractor, Pittman. Obviously counsel for Miller subsequently recognized, as the result of an exception which was maintained, that since no privity of contract existed between the subcontractor and the owner, the subcontractor could not institute a direct action against the owner.[18] Counsel then amended Miller's pleading and asserted therein, as we understand it, that a certain sum of money was due to him from the Housing Authority of New Orleans because it had conspired with Pittman to deprive him thereof. The record fails to reveal a scintilla of evidence in support of this accusation. Therefore, the lower court very properly dismissed this and all other demands made upon the Housing Authority of New Orleans.
For the foregoing reasons, the judgment of the lower court is amended as is hereinafter set forth. Therefore, it is ordered, adjudged and decreed that:
1. That part of the judgment rendered in favor of Charles X. Miller against Pittman Construction Company, Continental Casualty Company, Massachusetts Bonding and Insurance Company, New Amsterdam Casualty Company, and American Automobile Insurance Company, jointly and in solido in the sum of $41,001.52, less a sum sufficient to satisfy the levy recorded by the United States Government against the Pittman Construction Company, the judgment rendered in favor of August A. Weggmann, Receiver of J. J. Clarke Company, Inc., ($5,408.68), and $4,139.28 necessary to satisfy and discharge the lien filed by Schwartz Supply Company, Inc., and/or its assignee, is hereby amended by making any payments due thereunder by Pittman Construction Company to Charles X. Miller conditioned upon receipt by Pittman Construction Company from the Housing Authority of New Orleans of payment for the work performed by Charles X. Miller.
2. That part of the judgment described hereinabove is further amended by making *337 any interest due to Charles X. Miller begin to run ten days after final payment is received by Pittman Construction Company from the Housing Authority of New Orleans.
3. So as to decree that there be judgment in favor of Pittman Construction Company against Charles X. Miller in the amount of $742.57, representing $622.57 for costs incurred in removing the lien recorded by Miller and $120.00 for the cost incurred in removing the lien recorded by Schwartz Supply Company, Inc.
4. Decreeing that each party to this litigation, including the Housing Authority of New Orleans, pay its own court costs.
5. So as to the decree that there be judgment in favor of Maryland Casualty Company and against Charles X. Miller and Mrs. Charles X. Miller in solido in the amount of $249.45, representing expenses incurred herein by Maryland Casualty Company; this sum is in addition to $1,500.00 awarded Maryland Casualty Company as attorney's fees.
As thus amended and in all other respects, the judgment appealed from is affirmed.
Amended and affirmed.
NOTES
[1] The Pittman interests will hereinafter be referred to as "Pittman".
[2] None of Miller's work was involved in this dispute.
[3] See Pittman Construction Company v. Housing Authority of New Orleans, La.App., 169 So.2d 122 (1964).
[4] These claims will be discussed hereinafter.
[5] See LSA-Civil Code Articles 2207-2209.
[6] This reasoning equally applies to Miller's contention that the judgment is invalid because it is imprecise and because it recognizes that Miller's claim for the retainage is extinguished pro tanto by the amount of the Clarke lien.
[7] See Pittman Construction Company v. Housing Authority of New Orleans, 169 So.2d 122 (1964). Writs refused February 5, 1965.
[8] See LSA-Civil Code Articles 2021 and 2043.
[9] Stone v. Ellzey, La.App., 170 So.2d 120.
[10] Article 1.
[11] Rhodes v. Collier, 215 La. 754, 41 So.2d 669.
[12] See Act 229 of 1910; R.S. 13:4443 and 13:4444; Williams v. Nona Mills Co., 128 La. 811, 55 So. 414; Brown v. Green, 133 La. 725, 63 So. 303; Lagerquiste v. Standard Loan Office, 8 Orleans App. 315.
[13] In support of this contention, Miller cites Fetterolf v. S. & L. Construction Co., 175 App.Div. 177, 161 N.Y.S. 549; Pittsburg Filter Manufacturing Co. v. Smith, 176 Ky. 554, 196 S.W. 150; Howard v. Harvard Cong. Soc., 223 Mass. 562, 112 N.E. 233.
[14] See LSA-Civil Code Articles 2207 and 2208.
[15] "The prolongation of the terms granted to the principal debtor without the consent of the surety, operates a discharge of the latter."
[16] See Gulf Refining Co. v. Loeb, La.App., 195 So. 848; Succession of Moody, 245 La. 429, 158 So.2d 601.
[17] Southern Fleet Leasing Corp. v. Airline Builders Service, Inc., La.App., 136 So.2d 458.
[18] LSA-R.S. 38:2244. Compare LSA-R.S. 9:4806.