129 So.2d 620 (1961)
SANDEL & LASTRAPES, A Partnership, Plaintiff-Appellee.
v.
CITY OF SHREVEPORT, Defendant-Appellant.
No. 9433.
Court of Appeal of Louisiana, Second Circuit.
March 10, 1961.
Rehearing Denied April 12, 1961.
*621 J. N. Marcantel, H. Dan Sawyer, James J. Dormer, Loret J. Ross, Shreveport, for appellant.
Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for appellee.
Before HARDY, GLADNEY and BOLIN, JJ.
GLADNEY, Judge.
This is an action ex contractu for damages allegedly resulting from defendant's breach of obligation to furnish certain concrete pipe. Following trial, judgment was rendered in favor of plaintiff in the sum of $11,856.38. Plaintiff has answered defendant's appeal to this court and requested that the award and damages be increased to the sum of $18,814.38
*622 Plaintiff, a partnership engaged in the construction business, was awarded a contract by the City of Shreveport on August 14, 1956, for the construction of the "Lucas Outfall Pumping Station" for the sum of $245,375. The project was a portion of an over-all extension of the city's sewerage system being undertaken at that time. The contract fixed the date of completion as June 10, 1957, and pursuant to the issuance of a work order on August 14th, plaintiff commenced operations on August 15, 1956. The contract imposed upon defendant the obligation of furnishing 5 joints of 60 inch reinforced concrete pipe in 16 foot lengths weighing approximately 1,360 pounds per foot of length. The pipe was not a material house stock item, and special manufacture was required in order to meet the specifications. The contractor's initial operation was the excavation of a hole 25 feet 6 inches below the surface of the ground. The bottom of this hole was in excess of 60 feet square, being 4 feet wider in each direction than the structure that was built in it. At a point 10 feet below the surface of the ground the hole was extended an additional 15 feet in two directions, and an additional 8 feet in the other two directions. After the excavation was completed, a 3 foot concrete slab or floor was poured at the bottom, then 2 feet thick concrete walls were formed and poured to a height of 7 feet 6 inches, rising some 4 feet 6 inches above the normal ground. These walls were placed in two lifts, the first 12 feet high and the second 15 feet 6 inches. The plans called for the 60 inch reinforced concrete pipe to enter the building through this 2 foot concrete wall. When in place the bottom of the pipe was to be 10 feet above the low part of the excavation, and the top 16 feet above. The evidence indicates that the walls to 10 feet above the bottom of the excavation were completed about November 15, 1956. The structure had progressed to the point where the installation of the pipe could have been done any time after November 15th. On December 7th plaintiff addressed a letter to the attention of Charles B. Foster, Jr., the engineer representing defendant on the job, advising him that the work had proceeded to the point where the pipe must be installed, and asking that it be delivered to the job site as soon as possible. It was also requested that notice of expected delivery be given. The city at that time had not ordered the pipe. It was not until March 7th that necessary data was furnished to the Tex-Crete Company of Corpus Christi, Texas, and an order for the pipe was not given until April 10th. Delivery was made on June 20 and 26, 1957.
Plaintiff takes the position that the construction period was extended 272 days by reason of a 196 day delay in delivery of the pipe; that actual installation of the pipe under satisfactory conditions could have been performed within ten hours; and that by reason of the delay plaintiff encountered a period of excessive precipitation, thereby necessitating extra labor and services, which items make up the damages herein claimed.
In support of their demands evidence was submitted to the effect that upon timely delivery of the pipe the required excavation could have been accomplished without incurring unusual expense, but that in the four months preceding actual delivery of the pipe Shreveport's rainfall was a total of 13.08 inches in excess of normal. It is contended that the necessity of leaving the excavation open caused intense deterioration in soil conditions and presented almost impossible conditions for pipe placement, thereby requiring large amounts of concrete for stabilization and necessitating additional labor and other expenses. It is shown that during the period of November 15th to January 15th plaintiff had on hand certain mechanical equipment for handling the pipe which was not available immediately after the pipe was delivered, and in consequence thereof plaintiff was required to engage such equipment from the Reeder Construction Company. Further, *623 it is shown that the conditions brought about by the excessive rainfall required additional pumping equipment and services. Plaintiff also claims additional expenditure for insurance and taxes.
The defendant, by way of defense, generally denied the accrual of any damages, admitted the delay in delivery of the pipe, but strenuously urged that express provisions of the contract exempted the city from the payment of any damages by reason of delay on its part in the delivery of the pipe, and further, that the contract required plaintiff, as a condition precedent to any claim for damages, to submit a detailed schedule of all construction operations. The three clauses relied upon are:
"SC-5. Equipment and Materials Furnished by the Owner. Major items of equipment and materials which will be purchased by the Owner and which shall be installed by the Contractor under the provisions of these contract documents include the following:
"a. Pumping Equipment. Consisting essentially of three 10,200 gpm electric motor driven horizontal centrifugal type sewage pumping units complete with motors, foundation bolts, nuts and accessories, bed plates and other appurtenances, all to be located in the new outfall pumping station.
"b. Electrical Equipment. One set of metal-clad motor starting and control equipment to be located in the new outfall pumping station.
"c. Reinforced Concrete Pipe. All 60 inch reinforced concrete pipe required by the plans will be furnished by the Owner. Concrete pipe furnished will be provided with a plastic lining and will be furnished in 16 foot lengths (except for shorter closure pieces) weighing approximately 1360 pounds per feet of length. The pipe furnished will conform to ASTM Standard Specifications for Reinforced Concrete Culvert Pipe, Designation C76 and will be of the tapered slip-joint (tongue and groove) type provided with rubber gaskets as required for jointing.
"The 60 inch concrete pipe will be delivered to the trench side by the pipe manufacturer.
"SC-6. Delivery and Handling of Equipment to be Furnished by the Owner.

* * * * * *
"The Contractor's attention is directed to the fact that he will have to accept the risk of any delays in delivery of equipment to be furnished by the Owner and that in the event he is delayed in the prosecution and completion of the work because of this condition of delay, he shall have no claim for damages or contract adjustment, other than an extension of time and the waiving of liquidated damages for and during the period of time occasioned by such delay. All equipment shall be arranged and installed as indicated by the Plans and in conformity with approved installation drawings and instructions furnished to the Owner by the manufacturer of the equipment purchased."
"SC-15. Schedule of Operations. Before work is started, the Contractor shall prepare a detailed schedule of all construction operations that shall not only indicate the sequence of the work but also time of starting and completion of each part. The schedule shall be submitted to the Engineer for his approval. If conditions beyond the control of the Contractor justify, and the Owner approves an extension of contract time, the Contractor shall revise the construction schedule in accordance with the approved extension.
"The Contractor's attention is directed to the fact he will have to accept the risk of any delays caused by the rate of progress of the work to be performed under other contracts or by the City or Others and that in the event he is delayed in the prosecution and completion *624 of his work because of such conditions, he shall have no claim for damages or contract adjustment, other than an extension of time and the waiving of any liquidated damages for and during the period of time occasioned by such delay or delays."
In the trial court appellant filed an exception of no cause of action predicated on the provisions of Section SC-6 and SC-15, above quoted. It is argued that under the provisions of SC-6 the city was excused from liability for delays in delivery even though such delays are attributable to its fault. It was also argued that it was incumbent upon plaintiff to furnish the city with a schedule of operations such as provided for in SC-15 above quoted. Plaintiff's petition does allege that damages resulted from inexcusable delays on the part of the owner. It is contrary to public policy to allow a contractee to stipulate exemption from negligent acts which cause injury. Undoubtedly, the only effect that can be accorded to the non-liability provisions is that it was intended to be operative where the delay is not caused by the owner. The requirement that the contractor furnish the city with a work sheet showing detailed schedule of construction operations presents a matter of defense and was properly considered on trial of the case. We think the trial court was correct in overruling the exception.
Appellee earnestly contends that Section SC-6 pertains solely to "equipment" and is, therefore, inapplicable to the question at hand. It is asserted the pipe must be classified as "materials" and not "equipment". There is merit in this contention. SC-5 indicates such a distinction was made in this particular contract. This being true, the city has not expressly exempted itself from delays arising by reason of the delivery of material, which in this instance embraces the pipe. The proper meaning to be ascribed to "equipment" and "materials" has been of considerable concern to the courts and decisions thereon have not been entirely uniform. We have not been referred to an analogous Louisiana decision. We opine, however, that in ordinary usage of the building trade, "equipment" connotes the instrumentalities employed by the contractor to perform his agreed services. Tools, implements and appliances may be so involved and these are not usually employed for specific use and exhaustion upon a given piece of work. Thus, in United States Fidelity & Guaranty Company v. Feenaughty Machinery Company, 197 Wash. 569, 85 P.2d 1085, 1089, the court observed:
"To distinguish between materials and equipment is comparatively easy, since the term `materials' * * * includes such articles only as enter into and form a part of the finished structure, or, it may be, such articles as are capable of being so used and are furnished for that purpose, while `equipment' is, what the word imports, the outfit necessary to enable the contractor to perform the agreed services, the tools, implements and appliances * * *"
A similar conclusion was alleged in United States for Use and Benefit of J. P. Byrne & Co. v. Fire Association of Philadelphia, 2 Cir., 1958, 260 F.2d 541, 544:
"Shaped by this rule, perhaps the most important factor in distinguishing materials from capital equipment has been substantial consumption. A prime inquiry of the early decisions was whether the items involved were `normally intended for specific use and exhaustion upon the given piece of work, (or) are merely facilities for doing that work and any other work to which they may be applied.' United States, for use of Baltimore Cooperage Co., v. McCay, supra, D.C.Md., 28 F.2d 777, 780; United States, to Use of Galliher & Huguely, Inc., v. James Baird Co., supra, 64 App.D.C. 12, 73 F.2d 652. A more recent view, which we here adopt, focuses on the degree of expected *625 consumption of the items on the particular job for which they were furnished. Massachusetts Bonding & Insurance Co. v. United States, supra, 5 Cir., 88 F.2d 388. See Brogan v. National Surety Co., 246 U.S. 257, 38 S. Ct. 250, 62 L.Ed. 703, reversing National Surety Co. v. United States, for use of Pittsburgh & Buffalo Co., 6 Cir., 228 F. 577, L.R.A.1917A, 336."
It is conceded in brief and made clear by the plans and specifications that the subject pipe when installed became a part of the structure of the outfall pumping station. That is to say it could not be removed without damage to the building itself. The circumstances presented, read in the light of the foregoing authorities, impel us to hold that the 60 inch concrete pipe must be considered as "materials", and is not "equipment" within the intendment of clause SC-6 of the contract.
We are of the opinion that the defense predicated upon the effect of SC-15 is without merit. There is proof in the record that Foster, the City Engineer, as well as Stovall, an employee of Black & Veatch, consulting engineers employed by appellant, were in almost daily contact with the job and were well aware of plaintiff's immediate need of the pipe. Certainly, this was true after December 7th. These representatives of the city knew that the pipe was required at the very earliest stages of the construction work, and plaintiff's furnishing of the so-called schedule of operations could have served no useful purpose.
The record leaves no doubt that the city's delay in meeting its obligation to furnish the pipe was deliberate and was attributable to the city's postponement of its contract with the E. H. Reeder Construction Company, Inc. The latter company was awarded a contract at the same time as was plaintiff. Reeder was required to furnish and install as a part of the sewerage system some 8,000 feet of pipe similar to that to be furnished by the city. It was admitted by one of defendant's witnesses that the delay was prompted by financial reasons, i. e. a delay of the city in obtaining money or a delay for the purpose of obtaining a better price. It is significant that the city was obligated to furnish only 5 joints of 16 foot pipe and the record shows that such pipe could have been obtained from another source. Therefore, there appears no excuse for the city's breach of its obligation, particularly inasmuch as witnesses for the city conceded on the trial their knowledge of the damage being caused plaintiff by reason of the delay. Accordingly, it is our finding that appellant rendered itself liable for such damage as has been properly proven.
In support of its claim, the articles of plaintiff's petition set forth in minute detail every item of loss claimed. The items so described were considered by the district court with his finding that plaintiff had sustained a loss of $11,856.38, for which judgment was rendered. This was predicated on its finding that by reason of defendant's breach of its obligation to deliver the pipe, the actual construction period was prolonged for 162 days, during which time plaintiff was required to employ substantial manpower and equipment which would not have been required had the pipe been delivered prior to January 15, 1957. Composing the awarded amount were items for the use of a pick-up truck during pumping operations made necessary by a period of heavy rainfall, and the labor and pump rentals incurred in connection with the pumping operations, the whole amounting to $2,523.45; extra machinery and labor for excavation and extra concrete, $5,348.03; additional foreman time $3,128; and additional taxes and insurance $856.90.
Appellant has urged in its brief before this court that no allowance should be granted plaintiff for wages paid to, and use of a pick-up truck by, its foreman during the period prior to pipe delivery. The evidence, we think, demonstrates the necessity of employing the foreman during this period, and likewise, we think, it was *626 established that in order to perform his services he required the use of a truck. The transportation charges so made appear entirely reasonable.
By answer to the appeal plaintiff asserts that the sum of $862.15 should be awarded for supervision of labor personnel during the period of delay. Our appreciation of the evidence is in accord with the expressed views of the trial judge, wherein he discussed each of the items of damage awarded to plaintiff. We are convinced therefore, that plaintiff has proved his loss as to the extent set forth in the judgment. We do not agree with plaintiff that the item of $862.15 was erroneously rejected by the trial court. We find, as did the trial judge, that this claim was embraced in other claims relative to supervisory personnel which were allowed. The item thus presents a duplication and was properly denied. Plaintiff's claim for foreman's wages and transportation amounting to $1,318 was likewise properly denied as a duplication. Plaintiff re-asserts, by way of answer to the appeal, his claim for damages arising out of the city's delay in issuing a work order to the Reeder Construction Company. It is averred that such delay constituted an impediment to plaintiff forasmuch as the Reeder portion of the project remained unfinished and thereby congested plaintiff's work area when pipe delivery was finally made. In our opinion, the trial judge correctly denied the aforesaid claim as being unsupported by proof.
As a result of our study of the appeal, it is our finding that it requires affirmation, except for a minor modification pursuant to a suggestion from counsel for appellee, who has invited our attention to an error appearing in the allowance of $5,348.03, and acknowledged that the same should be corrected to read $5,168.03. This, accordingly requires the judgment to be reduced by the sum of $180. As so amended, the judgment is affirmed.