LANDRY, Judge.
The Department of Highways, State of Louisiana (Department) has taken this appeal from the judgment of the trial court awarding plaintiff, E. M. Freeman, d/b/a Freeman & Associates (Freeman), money judgment in the aggregate of $151,634.45, together with legal interest thereon, for engineering services performed by Freeman pursuant to two certain contracts and damages found to be due because of the Department’s alleged violation of the terms of the agreement resulting in losses to Freeman. In addition the lower court assessed all costs of trial against defendant. We find that in so decreeing our brother below fell into error and that his decision must be amended.
On this appeal the Department complains as follows: (1) the judgment in favor of Freeman is erroneous in that plaintiff has been paid all sums due him under the contracts; (2) plaintiff is not entitled to damages because there was no breach of either agreement by defendant and, alternatively, if there were a breach it was passive and plaintiff may not recover damages therefor because of his failure to place defendant in default; (3) the trial court erred in awarding interest on the amount of the judgment rendered inasmuch as interest is not recoverable against the state in the absence of a statute or stipulation so providing, and (4) the lower court improperly assessed all costs of trial against defendant whereas, being an agency of the state, the Department is by law exempt from payment of all court costs save and except stenographer’s fees for taking testimony.
On June 25, 1957, plaintiff and defendant entered into the first contract (known as Contract 13), pursuant to which plaintiff undertook to perform professional engineering services required for State Project No. 700-03-13 (Federal Aid Interstate Project No. 1-540(1), Greenwood-Shreveport Interstate Highway, State Route No. Louisiana 3029, Caddo Parish, Louisiana). Based on then available information, the Department estimated the cost of Project 13 at the sum of $5,700,000.00. The second agreement was confected May 19, 1958, and provided that plaintiff would furnish similar services for State Project 700-03-37 (Federal Aid Project No. 1-20-1(7) O, Texas State Line-Greenwood Highway, Interstate Route No. 1-20, Caddo Parish, Louisiana, (known as Contract 37). The cost of Contract 37 was initially estimated by the Department at the sum of $3,700,-000.00.
It appears that plaintiff’s organization is a long established and respected firm of consulting engineers and had previously served the Department in a similar capacity on another project. To perform the work required by Contracts 13 and 37, plaintiff E. M. Freeman employed his regular staff, augmenting same by the addition of four or five employees. In essence the contracts *190 ■called for plaintiff to furnish all engineering services for the design, planning, derailing, surveying, drawing, engineering and right of way acquisition requisite for the construction of the two projects. It -appears that these projects, in the vicinity ■of Shreveport, Louisiana, constituted a link ■in Interstate Highway 20 and included surface paving of dual laned highways, bridges, overpasses and interchanges with -accompanying cloverleafs and turn-outs.
Both contracts provided in substance that 'the work undertaken by plaintiff was to be ■divided into two phases, the first of which involved preliminary planning including •sub-surface investigation and delivery to 'the Department of preliminary plans and ■estimates of costs. Phase two encompassed preparation of and submission of final plans to the Department. In each instance •-it was stipulated that Phase I would be ■completed within six months following the Department’s notice to proceed therewith. Each agreement likewise stipulated that .‘Phase II was to be completed and right of 'way maps, contract plans, specifications ■ and estimates delivered to defendant within four months following notification to ■plaintiff to proceed with Phase II.
It is conceded that with regard to Con"tract 13, the Department issued orders to proceed under Phase I on July 9, 1957, -•and under Phase II on November 27, 1957; with respect to the second agreement, ■orders were issued to undertake Phase I on May 20, 1958, and commence Phase II on January 7, 1959.
In substance plaintiff’s claim is predicate ■ed on the contention that by virtue of the ■contracts and certain verbal commitments given by plaintiff to the then Director of 'the Department-, R. B. Richardson, plaintiff’s organization became a part of the -Department’s own activities. Plaintiff further shows that he commenced work in accordance with the terms of the contracts without delay, but due to procrastination on the part of the Department and its various agents and employees, beyond plaintiff’s control and in violation of the contracts, plaintiff was unable to complete Contract 13 until August 19, 1960 (26 months beyond the contemplated termination date) and was prevented from consummating Contract 37 until August, 1960, (one year and three months subsequent to its stated date of expiration).
Allowing twelve months for completion of Contract 13, plaintiff calculates his damages at the amount of his payroll directly attributable to said project subsequent to July 1, 1958, in the sum of $56,028.38, together with an additional $21,238.67 for overhead payroll or the sum of $77,267.05. Similarly, granting twelve months for completion of Contract 37, he determined payrolls directly attributable to said job subsequent to May 20, 1959, in the amount of $33,198.51, together with overhead in the sum of $16,249.18, making a total of $49,-447.69. In addition plaintiff prayed for further compensation due under Contracts 13 and 37 in the sums of $15,208.46 and $9,711.-30, respectively. Defendant admits owing plaintiff an additional $15,208.46, under Contract 13, but maintains said obligation is partially offset by overpayment of $10,-961.38 made on Contract 37. Alternatively, plaintiff prayed for judgment on quantum meruit in the sum of $226,532.73. The trial court’s judgment was for the amount of damages and earned unpaid compensation alleged by plaintiff to be due under the contracts, together with interest from date of judicial demand, until paid, and as aforesaid,' cast the Department for all trial costs.
The Department’s defense is predicated upon the following provisions appearing in each contract:
In Contract 13:
“Services to Be Performed By The Department
The Department will furnish the Engineers without charge the following services and data:
******
5. Prints of standard plans of bridges, culverts and incidental drainage struc *191 tures, prepared by the Department and approved for use on the Interstate Highway System. Tracing of such plans will be inserted in the final plans after delivery to the Department by the Engineers. Detailed information showing standard plans available will be furnished the Engineers prior to execution of this Contract.” (P-1, pp. 5-6)
“COMPENSATION:
The Department shall pay and the Engineers agree to accept fees in full compensation for the engineering services required of them under each of the foregoing Phases, as follows:
PHASE I — PREPARATION OF PRELIMINARY PLANS
In addition to the fee for subsurface investigations as specified in Item 5 of Phase I under the caption ‘Scope of Engineering Services,’ and based on the estimated construction cost of the total Project, all as developed for the preliminary plans and as approved by the Chief Engineer of the DEPARTMENT the fee of
(1) One per cent (1%) of such estimated construction cost, if the DEPARTMENT furnished the topographic survey, or
(2) One and twenty-five hundredths per cent (1.25%) of such estimated construction costs if the ENGINEERS make the complete topographic survey.
PHASE II — CONTRACT PLANS AND SPECIFICATIONS
For the preparation of plans, special specifications and estimates for the section or sections required and checking Contractor’s working drawings and shop details of the Project, the fee of two and Twenty-five one-hundredths per cent (2.25%) of contract costs for each and every such section as is placed under contract within four (4) calendar months after completion of the plans and the specifications for each individual section. Should award of any construction contract or contracts be delayed or deferred for any reason by the DEPARTMENT, final payment for such section or sections shall be based upon the ENGINEERS’ estimate of construction cost as approved by the Chief Engineer of the DEPARTMENT of such section or sections.” (P. 2-p. 6).
“REVISIONS OF PLANS:
Should major changes be required by the DEPARTMENT during the progress or after completion of the work, for which the ENGINEERS are not responsible and which will require revision of work otherwise satisfactorily accomplished, the ENGINEERS shall be paid additional compensation in the form of a lump sum which is mutually agreeable to the DEPARTMENT and to the ENGINEERS. If the parties hereto are unable to agree upon a lump sum for each additional work, the ENGINEERS shall be paid on the basis of their certified and itemized direct payroll costs plus one hundred per cent (100%) to cover overhead costs and profit.” P. 2,. p. 8).
“DELAYS AND EXTENSIONS:
The ENGINEERS will be given credit and extension of time for delays beyond' their control or for these caused by tardy approvals of work in progress by various official agencies, but no additional compensation shall be allowed for such delays.” (P. 2, p. 8).
“TERMINATION OR SUSPENSION:
The terms of this contract shall be binding upon the parties hereto until the work has been completed and accepted by the DEPARTMENT and all payments required to be made to the ENGINEERS have been made; but this contract may *192 be terminated under any or all of the following conditions:
* * * * * a H=
3. By either party upon failure of the other party to fulfill its obligations as set forth in this contract.” (P. 2, p.-8).
“ARBITRATION:
Any dispute concerning a question of fact in connection with the work not disposed of by agreement between the parties shall be referred to the Chief Engineer of the DEPARTMENT or his duly authorized representative for determination, whose decision in the matter shall be final and conclusive on the parties to this contract.” (P. 2-, p. 9).
In Contract 37:
“SERVICES TO BE PERFORMED BY TPIE DEPARTMENT:
The DEPARTMENT will furnish the ENGINEERS without charge the following services and data:
******
5. Prints of standard plans of bridges, culverts and incidental drainage structures, prepared by the DEPARTMENT and approved for use on the Interstate Plighway System for use under Phase I. Detailed information as to standard plans available will be furnished the ENGINEERS. Upon determination of the standard plans to be used for the final contract plans, the ENGINEERS shall request and the DEPARTMENT shall furnish mat films of the standard plans required for use in the final set of tracings.
It is the intent of this contract that the DEPARTMENT’S Standard bridge plans be used insofar as these plans are available in the design of all structures required for the project and that the ENGINEERS, under the stipulated contract fee, shall prepare complete designs •for structures required on the project for which DEPARTMENT standard bridge plans are not available.” (P. 33, pp. 5-6).
“COMPENSATION:
The DEPARTMENT shall pay and the ENGINEERS agree to accept fees in full compensation for the ENGINEERING services required of them under each of the foregoing Phases, as follows:
PHASE I — PREPARATION OF PRELIMINARY PLANS
In addition to the fee for subsurface investigations as specified in Item 5 of Phase I under the caption ‘Scope of Engineering Services,’ and based on the estimated construction cost of the total project as approved by the Chief Engineer of the DEPARTMENT, the fee of (1) One per cent (1.0%) of such estimated construction cost if the DEPARTMENT furnished the topographic survey, or
(2) One and twenty-five one-hundredths per cent (1.25%) of such estimated construction costs if the ENGINEERS made the complete topographic survey.
PHASE II — CONTRACT PLANS AND SPECIFICATIONS
For the preparation of plans, special specifications and estimates for the section or sections required and checking Contractors’ working drawings and shop details of the Project, the fee of two and twenty-five one-hundredths per cent (2.25%) of the contract cost for each and every such section as is placed under contract within four (4) calendar months after completion of the plans and the specifications for each individual section. Should award of any construction contract or contracts be delayed or deferred for any reason by the DEPARTMENT, final payment for such section or sections shall be based upon the ENGINEERS’ estimate of construction cost as approved by the Chief Engineer of the DEPART *193 MENT of such section or sections. (P. 3, pp. 6-7).
“REVISIONS OF PLANS
Should major changes be required by the DEPARTMENT during the progress or after completion of the work, for which the ENGINEERS are not responsible and which will require revision of work otherwise satisfactorily accomplished, the ENGINEERS shall be paid additional compensation in the form of a lump sum which is mutually agreeable to the DEPARTMENT and to the ENGINEERS. If the parties hereto are unable to agree upon a lump sum for each additional work, the ENGINEERS shall be paid on the basis of their certified and itemized direct payroll costs plus one hundred per cent (100%) to cover overhead costs and profit.” (P. 3, p. 9).
“DELAYS AND EXTENSIONS:
The ENGINEERS will be given credit and extension of time for delays beyond their control or for these caused by tardy approvals of work in progress by various official agencies, but no additional compensation shall be allowed for such delays.” (P. 3, p. 9).
“TERMINATION OR SUSPENSION:
The terms of this contract shall be binding upon the parties hereto until the work has been completed and accepted by the DEPARTMENT and all payments required to be made to the ENGINEERS have been made; but this contract may be terminated under any or all of the following conditions:
* * * * * *
3. By either party upon failure of the other party to fulfill its obligations as set forth in this contract.” (P. 3, p. 9).
“ARBITRATION:
Any dispute concerning a question of fact in connection with the work not disposed of by agreement between the parties shall be referred to the Chief Engineer of the DEPARTMENT or his duly authorized representative for determination, whose decision in the matter shall be final and conclusive on the parties to this contract.” (P. 3, p. 10).
Based on the foregoing contract terms, the Department in essence contends the agreements envisioned and contemplated delays from revisions and other causes and expressly provide that the Engineers would be given credit and extension of time for delays beyond their control or tardy approval of work in progress by various official agencies but that the Engineers would receive no additional compensation therefor. On this premise it is argued that since each contract provides in substance that revisions may be ordered at any time, even after completion of work by the Engineers on any phase of either contract, all revisions made were in accord with the terms of each contract. Defendant further contends all extra services required of plaintiff as the result of changes or revisions of work started or completed by plaintiff, was paid plaintiff at the agreed contract price of itemized direct payroll cost plus one hundred (100%) per cent to cover overhead costs and profit as stipulated in the paragraph entitled “REVISION OF PLANS” appearing in each said agreement.
Countering defendant’s contention, plaintiff maintains the delays and extensions provisions relied upon by defendant relieve defendant of liability only for delays occasioned by third parties and have' no application to delays attributable to defendant’s agents, employees or representatives. In so arguing, plaintiff relies upon Sandel & Lastrapes v. City of Shreveport, La.App., 129 So.2d 620, as authority for the proposition that such an exculpatory clause is contrary to public policy if intended to relieve one of his own negligence and therefore can apply only to third parties.
Plaintiff’s contentions regarding breach of the agreements by defendant allegedly *194 resulting in protracted delay in completing the projects involved and consequent loss to plaintiff may be summarized as follows: (1) Defendant’s employees tardily supplied or failed to supply standard plans for bridges, culverts and other structures as required; (2) the Department failed to furnish necessary preliminary right of way information, made revisions during the course of the work requiring the acquisition of additional right of way and failed to provide access to certain properties in order that plaintiff could complete right of way maps; (3) defendant delayed, ignored or deferred repeated requests for certain subsoil reports required by plaintiff in the design of a component of Contract 13 known as the Monkhouse Interchange, and (4) the Department was guilty of immoderate delay in approval of plans submitted for approval.
Plaintiff Freeman, a Civil Engineer licensed since 1930, testified the contracts were divided into two phases. Phase I, which was subdivided into two parts, namely, Division A which included general plans for the entire project, and Division B which covered sub-surface or soil exploration to determine below ground conditions which affect the design of sub-surface structures required to support bridges, overpasses and other similar components. Phase II of each contract covered final plans by means of which contracts for the work could be let. With regard to the soil exploration work, plaintiff’s obligation was to inform the Department of the data needed and prepare plans and specifications for performance of the sub-soil investigation. The actual tests were made by an independent firm engaged by the Department for the purpose, and over whose activities plaintiff had no control. Plaintiff’s sole connection with the sub-soil tests was to receive the information developed and utilize same in the preparation, planning and design of structures thereby affected. Conclusion of Phase I, according to plaintiff, depended upon the soil ex-plorasen tests which were not completed until long after the contract termination dates of Phase I. Notwithstanding his lack of sub-soil data, plaintiff nevertheless proceeded to draft plans for certain facilities, principally the Monkhouse Interchange, the design of which was dependent upon sub-soil information. It developed that the results of the tests when eventually made dictated a change in the “bell bottom” type foundation suggested by plaintiff to a sub-surface support consisting of piling. This change also necessitated considerable revision of the superstructure design recommended in plaintiff’s plans. In addition plaintiff complained that preliminary sketches and plans submitted to defendant for approval were shoved aside, disregarded and ignored for months despite his numerous supplications and requests for action thereon. Plaintiff also testified that on innumerable occasions his urgent requests for standard designs which the Department was obligated to furnish went unheeded for intemperate periods due either to defendant’s indifference to the request or inability to supply same because defendant in fact had no such standard plans. Plaintiff further contended the initial right of way information furnished was totally inadequate in that it consisted solely of a map on which the Department traced the route of the projects. This, plaintiff explained, caused much extra work. In this connection plaintiff also testified that he was delayed in obtaining right of way information by the failure of the Department to obtain permission from property owners to enter their premises for survey purposes, particularly property owned by the estate of one J. C. Dillinger, whose owners refused access thus delaying the survey several weeks. Further plaintiff maintains delays resulted when an intricate interchange was relocated from the intersection of the project with Curtis Lane to a point near the Shreveport Airport. This change required a complete redesign of the interchange from the sub-surface portion to the superstructure and caused considerable delay. Plaintiff also pointed *195 to numerous other changes including, inter alia, highway widths, slope of ramps, location of median strips, placement of certain light standards within the right of way to accommodate the airport and clearances of overpasses and bridges.
Based on the foregoing, plaintiff’s position, simply put, is that it was not contemplated the Department was authorized to unilaterally make such extended changes notwithstanding the revision privileges contained in the contract.
Defendant, however, contends it was known by all parties that the contracts were for the design of a major segment of an Interstate Highway (Federal Aid Project), embracing about 13 miles, which involved approval of plans by an agency of the Federal Government known as the Bureau of Public Roads and that because of the magnitude of the undertaking and certain imponderables which could be discovered only in the course of preparation of preliminary plans, changes and revisions were envisioned. Defendant further claims that it had, under the express terms of the contract, the right and privilege to make any changes or revisions desired at any stage of the work, even after approval of plaintiff’s plans therefor, defendant’s only obligation in such event being to reimburse plaintiff the cost therefor according to the formula provided in the agreements, namely, payroll cost plus an additional 100% as overhead. Defendant conceded it made the numerous changes alleged by plaintiff and contends plaintiff has been paid in full for the extra work resultant therefrom at the rates provided in the contracts. As to the delays alleged attributable to defendant’s reputed indifference and procrastination, it is defendant’s position first that the delays were neither inordinate or immoderate and alternatively, the contract expressly relieved defendant of liability for such delay assuming it resulted from defendant’s failure to timely respond to plaintiff’s requests. Some delays were attributed by defendant to plaintiff’s own action such as plaintiff’s premature design of the Monkhouse Interchange prior to receipt of sub-soil reports and to an extension of time granted the concern doing the soil tests at plaintiff’s request.
The voluminous record contains much testimony regarding the scope of preliminary plans and the duty of the engineers with regard to furnishing right of way information. The preponderance of evidence shows that preliminary plans require extensive field investigation and preparation of sketches showing the terrain over which the project will be constructed, the nature and design of the various facilities required such as bridges, overpasses and interchanges, and sub-soil information where relevant to the design of a component. It further appears that preliminary plans are utilized for what is known as a “plans in hand” inspection of the entire proposed route. With the preliminary plans in hand, the engineers follow the route of the proposed project foot by foot and thus discover the precise situation involved. In the course of the plans in hand inspections, it is usual and customary to consider alternatives to the preliminary plans dictated by circumstances and conditions thus discovered. While plaintiff concedes revisions and changes were contemplated after the plans in hand inspection, he maintains he was hampered in planning by the failure of the Department to furnish information required by the contracts. After the plans in hands inspection in the instant case, several major changes were found to be necessary including primarily relocation of the right of way to avoid a high pressure gas line, adjustments to be made for a railroad crossing, a change in width of certain segments of the projects. The Department concedes that an interchange initially planned for Curtis Lane was, after all plans had been completed therefor, shifted to Monkhouse Drive pursuant to a request from local authorities on the ground that the change would benefit the Shreveport Airport.
With regard to plaintiff’s obligation to furnish right of way data, the evidence *196 preponderates in favor of the conclusion that plaintiff was required to furnish detailed maps as well as a detailed property description of each parcel encountered so that the Department could negotiate with the individual owners. Although plaintiff complains of being furnished inadequate information, we believe the record establishes otherwise. As explained by E. J. James, Urban Engineer in the employ of defendant, right of way cannot be acquired until preliminary plans are in hand so that it can be determined the precise surface area over which the project will pass and only then will the Department know with which owners it must deal. James further explained it is customary, in such instances, that the Engineer furnish maps as well as complete detailed descriptions of each tract involved and the Department, utilizing this information, commences negotiations with the owners affected. Plaintiff’s contracts so provided. The Department acknowledges some resistance was encountered by plaintiff from property owners who denied access to their premises, thus delaying necessary survey work by plaintiff’s employees. Defendant contends, nevertheless, that first it was not responsible for such delays since they were occasioned by third parties, and secondly, when apprised of such circumstances, it arranged access as soon as expedient.
Defendant concedes plaintiff’s services were satisfactorily performed and throughout the entire duration of the project friendly relations existed between plaintiff and the agents and employees of the Department. The Department denies, however, any intent on its part to assimilate plaintiff’s organization into the Department as an integral part thereof. It is the Department’s position that it engaged a firm of engineers to perform a contract job and did not enlist each member of the firm as an employee.
Basically, plaintiff maintains that to perform the work required under the contracts, it was necessary to maintain his organization intact during the entire period for which remuneration is sought. He further contends the numerous major changes made by the Department should be paid for by additional compensation mutually agreed upon by the parties. Plaintiff also alleges he is not claiming any general overhead or profit but only the actual payroll cost plus 100% for overhead and profit attributable to these particular contracts. In this regard plaintiff acknowledges that during many of the periods in which his staff was awaiting approval of plans, they were totally inactive and did nothing whatsoever except wait. Plaintiff also conceded that during these intervals he attempted to secure other work to engage his staff but was unable to do so because there was no demand for such services due to prevailing economic conditions.
Plaintiff’s Chief Engineer, Louis Roeger, Civil Engineer, testified substantially the same as plaintiff. He narrated many instances of what he considered inordinate delay and changes of submitted plans previously approved by defendant. For example, he pointed out that almost immediately upon signing of the contracts a change was indicated in the location of the Curtis Lane Interchange. Plans for the Monk-house Drive Interchange submitted to the Department in October, 1959, provoked no action by the Department until May 5, 1960, when the Department indicated a change from the bell bottom footings recommended by plaintiff to another form of foundation which required redesigning of the entire facility, including sub-soil components and superstructure. Roeger also testified that the right of way information furnished by defendant consisted only of a survey showing the proposed alignment of the projects or the area through which it passed and which indicated that in general the route followed an abandoned railroad right of way. Pie also related instances of additional right of way being required in 1960 due to changes in the alignment of the route.
Ernest J. James, Urban Engineer, employee of the Department, testified the *197 Monkhouse Drive Interchange was added to and made part of Contract 13 increasing the magnitude of plaintiff’s undertaking. He also stated this increased plaintiffs compensation which was paid for at the stipulated contract rate. In essence James stated plaintiff was paid for all work the Department considered extra. He was of the further opinion that certain alternate plans prepared by plaintiff were envisioned under the contract which contemplated that in certain instances alternate proposals would be forthcoming from the Engineer to permit the Department to select the one found most suitable under the circumstances.
Regarding standard plans, defendant’s employee, A. J. Landry, Computer Engineer, testified the Department maintains standard plans for 99 items. A standard plan is shown to be a detailed design of a certain facility or component thereof ordinarily occurring numerous times in a given project. The facility or component is designed in detail and where required in a project is referred to simply by name or number thus eliminating the necessity of repetitious detailed description. For example, where a standard 6X6 concrete culvert is required, indication thereof is made by reference to its design number only.
That some delay was encountered in the furnishing of standard plans is indicated in the record. Moreover, plaintiff maintains Contract 13 obligated defendant to provide standard plans for numerous items for which defendant then had no such design. The Department, however, contends that Contract 13 only required it to furnish such standard designs as were available and that it so indicated to plaintiff by letter from James shortly after Contract 13 was signed. Plaintiff argues this position is totally unilateral and changed the terms of the agreement by defendant’s action alone. Our review of Contract 13 leads to the conclusion it contemplated defendant would furnish only such standard designs as were available.
Since the contracts were not let to bid within four months as stipulated in each agreement, plaintiff was paid on estimates as provided in both instances. Initially the Department estimated the cost of Contract 37 at $3,700,000.00. As work progressed, plaintiff was paid portions of his fee determined on the basis of the aforesaid original estimate. The contract was eventually completed at a cost of $3,350,158.59. Prior to completion, defendant revised its estimate of cost downward to $3,072,000.00 and contends plaintiff’s compensation for Contract 37 should be determined on this figure. It is on this premise that defendant maintains plaintiff was overpaid on Contract 37. It further appears, however, that one mile of road designed and planned by plaintiff was not included in Contract 37. Defendant’s experts estimated the cost of this excluded work at approximately $160,-000.00, whereas plaintiff’s witnesses assessed its cost at from $750,000.00 to $1,-000,000.00.
In arriving at the aforesaid reduced estimate of cost concerning Contract 37, defendant employed weighted averages obtained by averaging the costs of six similar interstate projects constructed in the general area and completed during the1 calendar year 1958. Upon objection by plaintiff, the trial court rejected the testimony which appears in the record as an offer of proof by defendant. We find the lower court properly excluded the prof-ferred testimony. First, because the testimony of Mr. Landry shows construction costs had risen appreciably between 1958 and 1960. Secondly, the cost per mile for highway construction is shown by the record to vary greatly dependent upon local conditions, and thirdly, because of the delays encountered, it now appears actual construction costs exceeded the reduced estimate notwithstanding a mile of the project was eliminated. Under the circumstances we find no error in the trial court’s *198 action in assessing plaintiff’s fees under Contract 37 on the original estimate of $3,700,000.00. The' figure thus determined is more than the actual cost plus defendant’s estimate of the cost of the excluded mile of highway, but considerably less than the actual cost plus plaintiff’s estimate of the cost of the excluded work. In so concluding, the trial court exercised the discretion vested in it. We think wisely so. Therefore, we concur with the finding of the lower court that plaintiff is entitled to additional compensation in the sum of $9,711.30 under Contract 37. The clear intent of the contracts is to fix the fee on construction costs where timely available. Had the work for these contracts been let within four months, actual construction cost would have been the criterion. The conclusion of the trial court accords with the intent of the contracting parties as expressed in the language of the agreement.
Numerous issues were raised by defendant concerning whether or not plaintiff placed defendant in default, when the alleged default took place and the amount of damages due plaintiff in the event defendant were properly defaulted. We find it unnecessary to consider these issues because the contracts themelves set forth the procedure to be followed and the rights, duties, obligations and privileges of the parties in the event of delay.
Before considering the hereinabove cited clear and unambiguous contract provisions which we deem decisive of the case at hand, we note that the parties are experienced in the complexities of highway construction and its attendant problems. We also find from the evidence that all concerned were or should have been aware of the delays normally to be expected in the course of road construction of the scope involved in these contracts. Nothing in the record indicates an overzealousness on defendant’s part to include exculpatory provisions in the contracts to diminish the effect of the agreements or take advantage of an inexperienced or naive party. The previously quoted paragraphs entitled “Revision of Plans” and “Delays and Extensions” expressly provide for the eventuality of delays and specifically and lucidly establish the mode of payment to plaintiff in the event delays should occur.
We also find that as an experienced engineer, plaintiff was or should have been aware of the likelihood of such delays and signed the contracts with full knowledge and appreciation of the possibility that progress of the work would from time to time be delayed by circumstances revealed during planning and construction, by changes dictated by the defendant during work progress and by the necessity of approval of plans both by various segments of the Department involved in a project of such magnitude and by at least one agency of the Federal Government.
It is well established that the terms of a contract is the law between the parties. LSA-C.C. Article 1901; Texas Co. v. State Mineral Board, 216 La. 742, 44 So.2d 841; Elliott v. Dupuy, 242 La. 173, 135 So.2d 54.
Plaintiff maintains, however, that the exculpatory provisions of each contract exonerating defendant from liability for delays is void as to defendant and applicable only as to delays occasioned by third parties for whose actions defendant is not responsible. This contention is predicated upon Sandel & Lastrapes v. City of Shreveport, La.App., 129 So.2d 620, wherein a similar provision was declared null as to a contracting party on the ground that permitting one to escape the legal effects of his own negligence is contrary to public policy.
We note that the decision reached in the Sandel case, supra, by our brothers of the Second Circuit held as indicated by plaintiff. We further observe that the conclusion reached is not supported by cita- . tion of authority.
Nor do we find J. Devereux O’Reilly & Co. v. Police Jury of St. Tammany Parish, *199 154 La. 57, 97 So. 296, cited and relied upon by defendant necessarily decisive of the issue presently under consideration. The Devereux case, supra, is distinguishable on its facts in that the court therein found no delay attributable either to defendant or its agents.
It appears the weight of authority in other jurisdictions upholds the validity of such exculpatory clauses when inserted in a public works contract to protect a governmental agency. See Erickson v. Edmonds School District No. 15 (1942) 13 Wash.2d 398, 125 P.2d 275, and cases therein cited.
The Federal Rule accords with the majority decisions as indicated by the following language appearing in Wells Brothers Company v. United States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148:
“Here is a plain and unrestricted covenant on the part of the contractor, comprehensive as words can make it, that it will not make any claim against the government ‘for any damages which may arise out of any delay caused by the United States’ in the performance of the contract, and this is emphasized by being immediately coupled with a declaration by the government that, if such a claim should be made, it would not be allowed.
Such language, disassociated as it is from provisions relating to ‘omissions from,’ the making of ‘additions to or changes in,’ the work to be done or ‘material’ to be used, cannot be treated as meaningless and futile, and read out of the contract. Given its plain meaning it is fatal to the appellant’s claim.
Men who take $1,000,000 contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work.
We are dealing with a written contract, plain and comprehensive in its terms, and the case is clearly ruled in principle by Day v. United States, 245 U.S. 159, 161, 38 Sup.Ct. [Rep.] 57, 62 L.Ed. 219, [221]; Carnegie Steel Co. v. United States, 240 U.S. 156, 164, 165, 36 Sup. Ct. [Rep.] 342, 60 L.Ed. 576 [578, 579]; Dermott v. Jones (Ingle v. Jones) 2 Wall. 1, 7, 17 L.Ed. 762 [764] and Chouteau v. United States, 95 U.S. 61, 67, 68, 24 L.Ed. 371 [373] * * * ”
Aside from our disagreeing with the rule of the Sandel case, supra, we find it distinguishable from the case at hand on the ground that in the Sandel case no provision whatsoever was made for payment due to any delay whatsoever. In the instant case provision is made for delay occasioned by major changes required by defendant either during the progress or after completion of the work and an agreed compensation provided therefor, namely, the itemized cost of payroll directly attributable thereto plus 100% to cover overhead costs and profit.
In view of the provisions of the contract before us, we conclude plaintiff is entitled to recover for changes and revisions ordered by defendant, but only to the extent of the cost of payrolls directly chargeable thereto plus 100%. It follows therefore that those payrolls incurred when plaintiff’s employees were idle and available for other work are not recoverable from defendant herein. In this connection plaintiff’s testimony discloses that during these periods plaintiff attempted to obtain other work to engage his staff but in most instances was unable to find other jobs because at the time there was limited demand for the services of consulting engineers. We find no merit in the argument *200 that plaintiff’s organization was assimilated into the operation of the Department and that in effect plaintiff’s employees .were entitled to be considered on the payroll of the Department for the duration of these jobs.
We next consider defendant’s contention it is exempt from payment of interest on the amount found to be due plaintiff because, as an agency of the State, the Department may not be cast for interest on judgments rendered against it.
Until the advent of Pittman Const. Co. v. Housing Authority of New Orleans, 169 So.2d 122, La.App. Fourth Circuit, it was well established in our jurisprudence that in the absence of statutory or contractual provision to the contrary, interest was not assessable against the state or any of its agencies in matters arising ex contractu. Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627. However, in 1964, our brothers of the Fourth Circuit, in Pittman Construction Co. v. Housing Authority of New Orleans, supra, held in substance that the effect of the Amendment of Article 3, Section 35 of the State Constitution by Act 621 of 1960 (approved by the electorate November 8, 1960) was to relieve the state and its agencies of immunity from liability as well as from suit thus stripping the state of its former immunity with respect to payment of interest on judgment awarded against it on suits based on contracts. Application for writs to the Supreme Court were denied.
Subsequently, in Southern Construction Company v. Housing Authority of City of Opelousas, La.App., 189 So.2d 454, our colleagues of the Third Circuit disagreed with the holding in the Pittman case, supra, and held that the 1960 Amendment of Constitutional Article 3, Section 35, did not relieve the state and its agencies of immunity from payment of interest in contractual matters.
The latest expression on the subject matter comes from the Supreme Court in Miller v. Housing Authority of New Orleans, et al., 249 La. 623, 190 So.2d 75, in which the court overruled the Fourth' Circuit (Miller v. Housing Authority of New Orleans, et al., La.App., 175 So.2d 326), and awarded plaintiff interest from date of judicial demand on a judgment rendered in an action ex contractu. Our appreciation of the Supreme Court’s remarks in the Miller case, supra, is that it forecloses the issues and squarely decided interest is recoverable from date of judicial demand in the instant matter. While we are inclined to agree with the holding of our brothers of the Third Circuit in Southern Construction Company, supra, nevertheless we acknowledge our obligation to follow the latest expression of our superiors on the Supreme Court. We hold; therefore, plaintiff is entitled to judgment on the amount recovered herein from date of judicial demand, until paid.
There remains the issue of assessment of all costs against defendant, a state agency. As regards assessment of costs against an agency of the State, counsel for plaintiff advances substantially the same argument presented with respect to interest. It is contended in effect that the 1960 amendment of Article 3, Section 35 of the State Constitution is an expression of legislative intent to place the state and its agencies in the same category of ordinary defendants insofar as court costs are concerned. Counsel for plaintiff maintains the intended effect of the amendment is to relieve the state and its departments of all immunities theretofore enjoyed.
We do not so view the effects of the amendment in question. We are aware of but disagree with the strong implication contained in Pittman Construction Company v. Housing Authority of New Orleans, La.App., 169 So.2d 122, wherein it is implied the state’s liability for costs are at least comparable to its liability for interest and principal. We must respectfully dissent from such view inasmuch as we consider the traditional immunity of the *201 sovereign is not to be deemed waived or surrendered by mere implication. It is our view that relinquishment of sovereign immunity can only be accomplished by express language clearly indicating such intent. It is our further judgment that an attempt at waiver of sovereign immunity in any respect whatsoever, must be strictly construed and limited to those immunities explicitly surrendered. Our statutory law has long established that the sovereign and its agencies shall be exempt from payment of court costs save and excepting stenographer’s fees for the taking of testimony. LSA-R.S. 13:4521. We find nothing in the cited constitutional provision indicative of intent to relinquish the state’s immunity provided in LSA-R.S. 13 :4521. Our brothers of the Second Circuit arrived at the same conclusion in Fullilove v. U. S. Casualty of New York, La.App., 129 So.2d 816, certiorari denied June 22, 1961, when it ordered the state be taxed with all costs “except such for which it is exempt by law.”
Accordingly, it is hereby ordered, adjudged and decreed that the judgment of the trial court be and the same is hereby amended and revised in that the award to plaintiff E. M. Freeman d/b/a Freeman & Associates, is reduced from the sum of $151,634.45 to the sum of $24,919.76, together with legal interest thereon at the rate of Five (5%) per cent per annum from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that the judgment of the trial court casting defendant, Department of Highways, State of Louisiana, for all costs of these proceedings be and the same is hereby annulled, reversed and set aside and judgment rendered herein casting said defendant for all costs incurred as stenographer’s fees for the taking of testimony, and directing that all remaining costs of these proceedings be paid by plaintiff, E. M. Freeman d/b/a Freeman & Associates.
Amended and affirmed.