222 So.2d 905 (1969)
PLANTATION PIPE LINE COMPANY, Plaintiff-Appellee,
v.
KAISER ALUMINUM AND CHEMICAL CORPORATION, Defendant-Appellant.
No. 7545.
Court of Appeal of Louisiana, First Circuit.
April 14, 1969.
Rehearing Denied April 14, 1969.
*907 F. W. Middleton, Jr., of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for defendant-appellant.
John V. Parker, of Sanders, Miller, Downing & Kean, Baton Rouge, for plaintiff-appellee.
Before LANDRY, REID and SARTAIN, JJ.
SARTAIN, Judge.
Appellant, Kaiser Aluminum and Chemical Corporation (Kaiser) seeks reversal of a judgment of the district court in favor of Plantation Pipe Line Company (Plantation) in the amount of $85,946.65, representing damages to Plantation's pipe line facilities admittedly resulting from Kaiser's negligence.
In January of 1942, the Solvay Process Company (Kaiser's predecessor in title) entered into an agreement with Plantation which granted Plantation an "easement and permit" for the installation and operation of ten pipe lines through Solvay's property. Solvay later conveyed to Kaiser a portion of the lands burdened with and subject to the previously granted "easement and permit".
On December 4, 1964, there existed four 12 inch pipe lines owned and operated by Plantation and crossing the property of Kaiser. Traversing a portion of Kaiser's property from east to west is Monte Sano Bayou which empties into the Mississippi River a relatively short distance west of Plantation's lines. Plantation's lines as they cross the bayou are exposed and are supported at about normal ground level by five concrete piling structures referred to in the engineering profession as bents. These facilities each consist of three 16 inch square concrete piles supporting a concrete cross member 24 feet in width on which the pipes rest.
During the week-end of December 4th through 7th, 1964, the four most southerly bents were severely damaged when a portion of the south bank of the bayou collapsed causing an earth slide.
It is undisputed and acknowledged that the slide was precipitated by Kaiser's placement of huge quantities of a bauxite waste by-product known as pisolite on its property at a point south of the bayou and east of Plantation's pipe lines.
In the course of its manufacturing process Kaiser must daily dispose of tremendous amounts of this material. Kaiser had previously used another area where 100,000 tons of this material were deposited. In August, 1964 it then became necessary that the area near Plantation's servitude be used as this material was accumulating at the rate of 900 tons a day. The earth slide in question resulted from the inability of the sub-soil beneath the pisolite dump to withstand the increased weight of the recently deposited material causing the bayou bank to slide or "slough" off. Plaintiff's pipe supporting structures were damaged as a result of the force of the land slide which actually shifted the land beneath the pilings.
The trial judge reviewed in detail the pertinent testimony of the witnesses. This testimony reflected that Kaiser had on previous occasions conducted extensive studies of the sub-surface soil conditions of their properties near Monte Sano Bayou and had in fact formulated certain safety factors to be followed in stockpiling these huge quantities of pisolites. The safety factors provided that the height of the pile to be limited to 14 feet and the "toe" or outer extension of the pile was restricted to 100 feet from the banks of the bayou. The maximum safe load was predetermined at 1500 pounds per square foot.
The trial judge found that at the time of the slide the stockpile had peaked at 25 *908 feet or 11 feet over the previously established safety limit. Realizing that an unusual situation existed Kaiser discontinued major use of the area near Plantation's lines but did on occasions use it intermittently "in an emergency basis". As a matter of fact just shortly before the slide occurred a bull dozer was being operated in the area spreading the deposited material.
We concur with the trial judge's findings of fact as stated in his written reasons for judgment, to-wit:
"Now, it is apparent that from the recitation of the facts relating to Kaiser's operations that the overloading of the area near the bank with the pisolite material was the main factor in precipitating the slide. That Kaiser was well aware that it had violated its own safety regulations is not disputed.

The impending possibility of a slide was very much in the minds of the Kaiser personnel. Mr. Charles Breaux, the senior engineer of the Baton Rouge works, testified that they knew the conditions which existed and were very concerned about a slide on the south bank of the bayou; however, he said their concern was that the slide might block the bayou crossing causing a flooding condition. He declared they never anticipated that the slide would move westward and cause damage to Plantation's pipe line. Additional testimony further showing Kaiser's informed position concerning slide possibilities is found in the testimony of Nathan Anderson, Kaiser's plant engineer at the time. He said, `We knew there might be a slide, but we did not anticipate the damage would be anything but minor. We just misjudged the situation * * *. It was a borderline case, and it became an actual case.'

The only reasonable conclusion which can be reached from this testimony is that Kaiser personnel realized the distinct possibilities of a slide of the material, but the far-reaching effect of the consequences were not anticipated. And yet, despite this realization of the situation and conditions present, they continued to allow the deposit of additional materials after August of 1964. In almost a plaintive manner Mr. Breaux declared, `We had to put the material somewhere.'

The Court believes that the actions of Kaiser in this respect constitute negligence and as submitted by counsel for Plantationprobably gross negligence. Certainly there was a reckless disregard by Kaiser of the consequence of its actions." (Emphasis ours)
Kaiser's principal defense is predicated upon a provision in the original agreement between Solvay and plaintiff which reads as follows:
"Solvay expressly reserves, for itself and its said tenants, the right to make every use of said lands and premises which shall be found necessary to its or their present or future operations, and Solvay shall not be liable to Plantation for any loss or damage to said pipe lines resulting from any use of said lands and premises by Solvay or its said tenants." (Emphasis ours)
With respect to this provision the trial judge considered subsequent agreements entered into between plaintiff and the Reconstruction Finance Corporation (Solvay's successor and Kaiser's predecessor in title). This latter agreement has the following provision:
"This servitude or easement is granted to and accepted by Plantation Pipe Line Company in lieu and substitution of the servitudes or easements heretofore granted in its favor over the land over which this servitude or easement extends and particulary the servitudes or easements granted by the Solvay Process Company to Plantation Pipe Line Company on January 23, 1942, * * *."
The trial judge also concluded that Plantation enjoyed the status of a servitude *909 owner as evidenced by an agreement dated February 5, 1954 between the parties hereto which contains the following language:
"Whereas, Plantation is the owner of a servitude and right of way and easement for the purpose of constructing, maintaining and operating, repairing, removing, changing the size of and replacing pipe or pipes for the transportation of oil, crude petroleum and refined petroleum products * * *."
Accordingly, the trial judge determined that contractually Kaiser acknowledged the right of Plantation to use the servitude for the purposes previously outlined and that Plantation was entitled to all rights accruing to a servitude owner under the laws of the State of Louisiana. This meant that Kaiser had "pledged itself not to encroach upon nor effect any changes in the terrain of Plantation's right-of-way, except as permitted in the agreements."
The trial judge then stated:
"Kaiser in denying liability argues that, because of the provisions of the reservation paragraph, it should be exempt from responsibility. In support of this position defendant relies, in part, on Article 752 of the Civil Code quoted as follows:
'Legal servitudes and even those which result from the situation of places, may be altered by the agreement of parties, provided the public interest does not suffer thereby.'
It seems to the Court, that as contended by the plaintiff, Article 752 and the provision relied upon should be construed so as not to defeat the purpose for which the servitude agreement was confected. Further, our courts have held that public policy prohibits one from contracting away responsibility for his own negligence. Hayes v. Hayes, 8 La.Ann. 468 and Sandel & Lastrapes v. Shreveport [La.App.], 129 So.2d 620. Counsel for plaintiff has ably expressed the interpretation the Court gives to this disputed provision and its relation to the entire contract and, accordingly, I quote from his brief: `* * * the right to make "every use" of the land does not include the right to make negligent use of the land, resulting in harm to others.'" (Emphasis by the trial judge)
Kaiser urges here on appeal that the exculpatory provision of the initial agreement between Plantation and Solvay does not contravene public policy and cites Jennings v. Ralston Purina Company, 201 So.2d 168 (2d La.App., 1967); Freeman v. Dept. of Highways, 197 So.2d 188 (1st La.App., 1967); Arnold v. Stupp Corporation, 205 So.2d 797 (La.App., 1st Cir., 1968); Forsyth v. Jefferson Downs, Inc., 152 So.2d 369 (La.App., 4th Cir., 1963) writ refused 244 La. 895, 154 So.2d 767 (1963); Celestin v. Employers Mutual Liability Insurance Company of Wisconsin, 387 F.2d 539 (5th Cir., La., 1968). Accordingly, they contend that the trial judge erred in relying on the Hayes and Sandel cases as controlling for the proposition that it is against public policy for one to absolve himself of his own negligence by contract. In Freeman this court had occasion to disagree with the holding of our brethren of the Second Circuit in Sandel. Because of this difference of opinion, the Louisiana Supreme Court granted writs and in their decision (217 So. 2d 166, 177) stated:
"On the facts found by the Court of Appeal on the merits of the case, we think it clear that the matter may be distinguished from the case at bar. However, it is true that, in considering an exception of no cause of action filed by the City, which was predicated on the provisions of Sections SC-6 and SC-15 of the contract, the Court of Appeal ruled that the exception was without merit because the exculpating clauses were contrary to public policy since they would permit a contractee `* * * to stipulate exemption from negligent acts which cause injury.' No authority is cited for this holding, and we know of none which supports the view that it is against public policy for contracting parties to agree *910 that, in case one of them fails to perform a certain act timely and thus delays the other in the performance of his obligations, the former will not be held responsible for any damages caused by the delay. Accordingly, in this respect, we find that the Court of Appeal, First Circuit, was correct in refusing to follow the decision in the Sandel case."
While we agree with counsel for Kaiser that the Hayes and Sandel cases are not in themselves dispositive of the issue here, we concur with the result reached by the trial judge when he considered the other agreements (quoted above) which pertain to the same servitude and the rights and obligations of the parties and their successors which flow therefrom.
In the final analysis, the decision for resolution here concerns the interpretation of the first mentioned provision. Is the reservation of the "* * * right to make every use of said lands * * *" so exculpatory as to include "negligent use" thereof as urged by Kaiser; or, is the provision subject to a different interpretation that excludes negligent use of the lands and liability for resulting damages as urged by Plantation?
The trial judge's consideration of previous agreements concerning the subject of servitude adopts the contention of Plantation's counsel who urged that although the contract in question is a servitude agreement, the rules of our Civil Code relative to the interpretation of agreements are nonetheless applicable. The pertinent articles which apply in the instant matter are:
Article 1945:
"Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
* * * SecondThat courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
"ThirdThat the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences; * * *"
Article 1948:
"When there is a doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in making the same contract."
Article 1949:
"When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question."
Article 1950:
"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."
Article 1951:
"When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nugatory."
Article 1955:
"All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act."
Other articles of the Civil Code relative to servitudes that should be considered are:
Article 771:
"When a servitude is established, everything which is necessary to use such servitude is supposed to be granted at the same time with the servitude. * *" *911 Article 772:
"He to whom a servitude is due, has a right to make all the works necessary to use and preserve the same."
Article 777:
"The owner of the estate which owes the servitude can do nothing tending to diminish its use, or to make it more inconvenient. * * *"
A perusal of the above articles clearly announces the proposition that it is the duty of the court to determine the true intent of the parties (C.C. Art. 1945). When there is doubt as to the true sense of the words of a contract reference may be had to other words or phrases in making the same contract (C.C. Art. 1948); or, when there is anything doubtful in one contract reference may be had to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question (C.C. Art. 1949). Also, when there is anything doubtful concerning a provision in an agreement the court must ascertain the common intention of the parties rather than adhere to the literal sense of the terms (C.C. Art. 1950) and interpret the contract in such a manner as to give it effect rather than render it nugatory. In doing so all clauses are interpreted one by the other, giving to each the sense that results from the entire act. (C.C. Art. 1955).
In the agreement under consideration which was executed on January 23, 1942, two things are purported to be accomplished, namely: (1) the granting of a servitude by Solvay to Plantation which would permit the establishment of ten 12" pipe lines by Plantation; and, (2) the reservation by Solvay of the "complete use" of its lands and release from "any loss or damage" resulting from such use by Solvay. The first purpose is clear and presents no problem. The second reason is not clear and is the subject of this litigation. In resolving the intent of Solvay in reserving unto itself the future use of its lands we note that the first controversy concerning the intent of the agreement occurred in 1947 between plaintiff and Reconstruction Finance Corporation (Kaiser's predecessor in title) and this controversy was resolved on April 16, 1947 by the execution of a new agreement which had for its express purpose a settlement of issues growing out of the first agreement and giving rise to a suit in the U. S. District Court of Louisiana. This agreement was in lieu of the servitude granted by Solvay on January 23, 1942. The new agreement contained no exculpatory clauses.
Subsequently, each time Kaiser endeavored to construct on or over or in any other way encroach upon the servitude granted Plantation specific authority was obtained from Plantation and such changes and additions were performed at the cost of Kaiser. This is the agreement dated February 5, 1954 and other similar agreements dated January 20, 1958, March 30, 1960 and August 2, 1962.
These agreements and particularly that of April 16, 1947, clearly evidences an intent contrary to Kaiser's interpretation of the exclusionary clause. These agreements also clearly distinguish the case at bar from the facts which supported our conclusion in the Freeman case. More on this latter point later.
Counsel for Kaiser contends that the agreement of April 16, 1947 is not applicable to the instant controversy because it pertains to lands other than that in which the land slide occurred. The matter may be more clearly understood if we note that Kaiser's plant is located on the east bank of the Mississippi River immediately south of the old bridge. Monte Sano Bayou traverses Kaiser's property from east to west and empties in the Mississippi River. Kaiser purchased its property from two owners. The property north of Monte Sano Bayou was purchased from the Reconstruction Finance Corporation. The property south of the bayou was purchased from Solvay. Kaiser argues that inasmuch *912 as the agreement of April 16, 1947 was between Plantation and Reconstruction Finance Corporation, the agreement only modified that portion of the servitude which was located north of the bayou and that the original agreement remained in effect when Kaiser purchased the southern portion of its property directly from Solvay. While it is true that the parties are not the same it nevertheless remains that Reconstruction Finance Corporation was a successor in title to Solvay, predecessor in title to Kaiser, and clearly shows what intent Reconstruction Finance Corporation and Plantation gave to the original agreement. We do not see how Kaiser at this time can imply a different intent than did its predecessors in title.
As stated above the facts in this case are clearly distinguishable from those of the Freeman case for here we have subsequent interpretations placed on an agreement together with supplemental agreements specifically negating exculpatory intentions.
In Freeman the Supreme Court on rehearing footnoted with approval the factual basis upon which we upheld an exculpatory provision, to-wit: (217 So.2d 166, 175)
"4. In this connection, the Court of Appeal in its opinion correctly observes:
"Before considering the hereinabove cited clear and unambiguous contract provisions which we deem decisive of the case at hand, we note that the parties are experienced in the complexities of highway construction and its attendant problems. We also find from the evidence that all concerned were or should have been aware of the delays normally to be expected in the course of road construction of the scope involved in these contracts. Nothing in the record indicates an overzealousness on defendant's part to include exculpatory provisions in the contracts to diminish the effect of the agreements or take advantage of an inexperienced or naive party. The previously quoted paragraphs entitled `Revision of Plans' and `Delays and Extensions' expressly provide for the eventuality of delays and specifically and lucidly establish the mode of payment to plaintiff in the event delays should occur.

`We also find that as an experienced engineer, plaintiff was or should have been aware of the likelihood of such delays and signed the contracts with full knowledge and appreciation of the possibility that progress of the work would from time to time be delayed by circumstances revealed during planning and construction, by changes dictated by the defendant during work progress and by the necessity of approval of plans both by various segments of the Department involved in a project of such magnitude and by at least one agency of the Federal Government.' (See 197 So.2d at page 198.)" (Emphasis ours)
In short, we said that the language therein contained was clear and unambiguous and that nothing in the record indicated an overzealousness on defendant's part to include exculpatory provisions or to take advantage of an inexperienced or naive party. We also noted that an experienced engineer such as Freeman was or should have been aware of the likelihood of the delays that followed and the necessity of approval of plans by various agencies all of which Freeman complained caused him damages.
Such are not the facts in the case at hand. Any doubts as to the meaning of the exculpatory clause now asserted by Kaiser were resolved against them by their predecessor in title, Reconstruction Finance Corporation. Further, we find as did the trial judge that Kaiser knowingly exceeded its own safety requirements by literally doubling the risk. By their own admission they were not to pile these pisolites to a height greater than 14 feet nor to a point within 100 feet of the bayou. By *913 permitting this material to be deposited in closer proximity to the bank of the bayou and at a height of 25 feet Kaiser took a deliberate calculated risk. This risk was taken knowing that the land upon which this material was deposited was subject to slides. The record reveals that as far back as 1953 Plantation protested the deposition of debris by Kaiser on their right of way on the north side of the bayou; that a bank slide similar in nature to the instant one though not of such magnitude occurred on January 27, 1954 which resulted in Kaiser's payment for damages to one of Plantation's concrete bents. Further, in 1954 extensive sub-surface soil studies were made by Kaiser which conclusively pointed up the instability of the land bordering the bayou and the reason for the 1954 slide. It is also noted that in 1953 while Kaiser was constructing a mud thickener on land near the bayou two slides occurred. All of this points up our reasoning for concurring with the aforementioned findings of fact by the trial judge which facts also distinguish this case from the Freeman case.
In Freeman we were concerned with delays which we held should have been reasonably foreseen by Freeman as an experienced engineer. In the instant matter we have a deliberate use of land by Kaiser near Plantation's right of way when Kaiser was fully possessed of information clearly indicating the possibility of a slide with resulting damages. This is quite evident when Kaiser's engineer stated "We knew there might be a slide but we did not anticipate the damage would be anything but minor. We just misjudged the situation * * * It was a borderline case and it became an actual case." The appellation of gross negligence to this incident by the trial judge under these circumstances is not manifest error.
Finally, it is urged that Plantation is bound by the initial agreement and particularly the aforementioned exculpatory clause because the agreement was entered into for a nominal consideration of $1,000.00. There is not one scintilla of evidence in this entire record to support any conclusion that this was not anything but fair and adequate compensation for a servitude. If this was an inadequate or nominal consideration the burden rests with Kaiser to show this and in the absence of such showing we have no other alternative but to conclude that the agreement was entered into between two knowledgeable corporations after appropriate bargaining. There is nothing in this record to further indicate that Plantation was granted this servitude as a gratuity or was permitted to cross the lands of Solvay by sufferance.
Finally, Kaiser urged contributory negligence on the part of Plantation asserting that the latter's pipe line walkers should have observed the storage of the pisolites in close proximity to Plantation's lines and having observed the same should have taken necessary steps to warn Kaiser of or take necessary steps to prevent the impending land slide. We agree with the trial judge's determination that the defense of contributory negligence is without merit for the reason that Plantation's employees did not have available to them the information that remained within the knowledge of Kaiser's personnel.
Accordingly, for the above and foregoing reasons the judgment of the district court is affirmed at appellant's costs.
Affirmed.
LANDRY, Judge (dissenting).
As I understand it, the basic issue involved in this litigation is whether a party may contract to release himself from the consequences of his own future tortious actions.
Plaintiff herein seeks to recover damages to its pipeline expressly averred to have resulted from defendant's negligence. Defendant counters with the proposition that the provisions of the servitude agreement include a self-contained release clause exculpating defendant from liability for any damage to plaintiff's lines even such as *914 might result from defendant's own negligent actions.
Plaintiff-appellee relies upon the jurisprudence contained in Jennings v. Ralston-Purina Company, 201 So.2d 168, and Arnold v. Stupp Corporation, 205 So.2d 797, and authorities therein cited, as establishing the rule that a hold harmless or exculpatory clause in a contract will not be construed to relieve one of the consequences of his own negligence unless the word "negligence" is expressly included. The clear import of the Arnold case is that in such instances the courts will look no further than the contract provisions themselves and if the word "negligence" is not used, the contract does not release the indemnitor or tort feasor from the effects of his own negligence. Therefore plaintiff argues, according to Jennings and Arnold, supra, since the word "negligence" does not appear in the contract before the court, there is no need to look further to determine what the parties intended. Failure to use the sacramental term "negligence" pretermits any additional consideration of the question of interpretation. This result, I believe to be an erroneous crystallization of the prior jurisprudence.
On this basis plaintiff contended most forcefully, both in oral argument and brief, that since the word "negligence" was not included in the so-called exculpatory clause, only one interpretation of the contract was possible, namely, that it did not exonerate defendant from the consequences of its own negligence.
In my humble judgment the majority have erroneously held that the Jennings and Arnold cases, supra, are inapplicable herein because the original agreement was in effect modified by amendment entered into on April 16, 1947, between Kaiser's predecessor in title, Reconstruction Finance Corporation (Reconstruction), and plaintiff and which amendment, although it did not include the lands in question, is nevertheless binding upon Kaiser as successor to Reconstruction. On this premise the majority have apparently held the "exculpatory clause" in the initial contract is now a matter of no moment and the sole question to be decided herein is the intent of the parties concerning the scope of the reformed agreement.
I disagree with the finding that there was intent on the part of the parties to change the initial agreement. I also disagree with the conclusion that any agreement on the part of Kaiser's predecessor, Reconstruction, is binding upon Kaiser who was not a party thereto. Assuming arguendo, the correctness of the majority finding that the contract was modified as to lands not involved in this present controversy, I disagree with the majority finding that the revision was binding upon Kaiser for two reasons. First, because Kaiser was not a party thereto, and secondly, for the reason any such revision must perforce be limited to the property therein expressly affected.
I find no merit in plaintiff's contention that the "exculpatory clause" is void as contra bonos mores, insofar as it seeks to relieve Kaiser of the effects of its own negligence. This position is based on the Jennings and Arnold cases, supra, which in turn are predicated upon what I believe to be an erroneous interpretation by the Courts of Appeal of the early Supreme Court decision of Hayes v. Hayes, 8 La. Ann. 468. So far as I am aware, the Hayes case, supra, is the only Supreme Court decision dealing with this subject matter until the advent of the recent Freeman case hereinafter discussed. In my opinion, the Courts of Appeal commencing with Sandel & Lastrapes v. City of Shreveport, infra, and culminating in Arnold v. Stupp, supra, have extended the doctrine of the Hayes case, supra, far beyond the original intent of the Supreme Court. To be more precise, it appears to me that by the process of evolution, the Courts of Appeal have in effect enlarged the doctrine of Hayes, supra, to mean that a party may not contract away his liability in tort unless the word "negligence" is expressly *915 used. In oral argument and brief, counsel for plaintiff relies on Arnold, supra, and the other authorities hereinafter discussed, as authority for the rule that in cases of this nature, use of the word "negligence" is sacramental and failure to employ that precise term raises an irrebutable presumption against the release of a party from the effect of his own negligence.
On several occasions our courts have considered the effect of release clauses similar to that involved herein. In most instances, however, the contracts were "hold harmless" or "indemnity" contracts. The instant case, however, does not involve a hold harmless or indemnity agreement but rather an "exculpatory clause" otherwise known as an "anticipatory release", which is basically different in nature from an ordinary contract of indemnity as hereinafter shown. It appears the majority of cases decided by our own courts in this field have involved indemnity contracts rather than exculpatory agreements. So far as I am aware, no decision of our own state has attempted to differentiate between indemnity agreements and anticipatory releases.
Fundamentally, an indemnity or hold harmless agreement is one wherein the indemnitor agrees to protect the indemnitee against the claims of third parties alien to the indemnity contract itself. Such agreements do not purport to deprive the third party of his claim against the indemnitee, they merely affect a change in the party ultimately obligated to pay the damages due. An anticipatory release, however, deprives the injured party of the right to recover from the other any damages caused by the actions of the party released. As applied in tort actions, an exculpatory clause is but an antecedent release of liability for a tort which may be committed in the future.
Both hold harmless agreements and exculpatory clauses have been treated at length in an excellent article entitled "Limiting Liability for Own Negligence", appearing in Volume 175 A.L.R. commencing at page 1. Commenting upon anticipatory releases, the writer at 175 A.L.R., pages 13 and 14, notes:
"The rules of general applicability suggested by the American Law Institute for the determination of the validity of bargains from exemption from liability for negligence read as follows:
§ 574. A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in § 575.
§ 575. (1) A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if (a) the parties are employer and employee and the bargain relates to negligent injury of the employee in the course of the employment, or (b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.
(2) A bargain by a common carrier or other person charged with a duty of public service limiting to a reasonable agreed valuation the amount of damages recoverable for injury to property by a non-wilful breach of duty is lawful."
Following the above, the author proceeds to show that the "clear cut rule" suggested by the quoted Sections of American Law Institute is not in fact supported by the jurisprudence. Rather it appears the authorities are not in accord concerning validity of such clauses or agreements. Numerous jurisdictions seem to expressly hold one may not contractually relieve himself of the effects of his own negligence, see *916 for example, Conn v. Manchester Amusement Co., 79 N.H. 450, 111 A. 339; other authorities contain dicta to that same effect, see Jankele v. Texas Co., 88 Utah 325, 54 P.2d 425. In some instances the principle of invalidity is limited to situations involving performance of a legal duty such as in Ex Parte Mobile Light & R. Co., 211 Ala. 525, 101 So. 177, 34 A.L.R. 921, or a duty of public service, see Emery v. Rochester Teleph. Corp., 156 Misc. 562, 282 N.Y.S. 280, or where a public duty is owed, public interest is involved, or public interest requires performance of a private duty, King v. Smith, 47 Ga.App. 360, 170 S.E. 546; Globe Home Improv. Co. v. Perth Amboy Chamber of Commerce Credit Rating Bureau, 116 N.J.L. 168, 182 A. 641, 102 A.L.R. 1068.
The common denominator of all the decisions proscribing exculpatory clauses which release one from the effects of his own derelictions is unquestionably that of public policy. The proclaimed rationale of the rule is that if such clauses violate public policy, they are void, otherwise they are valid and enforceable. It appears beyond question that such is the majority rule.
A minority of jurisdictions, however, hold the right to freedom of contract superior in determining the validity of agreements which exempt one from the effects of his own negligence and consequently all such agreements are not necessarily void as violative of public policy. See Checkley Illinois C. R. Co., 257 Ill. 491, 100 N.E. 492, 44 L.R.A.,N.S., 1127. Even the minority, however, prohibit such agreements in areas involving public service or duty and also those wherein the parties do not have equal bargaining power, the latter primarily, but not exclusively, in the fields of employer-employee relations and common carrier and passenger or shipper.
It further appears that the majority of jurisdictions adhere to a rule of strict construction in the interpretation of anticipatory releases. As a result, most jurisdictions have declared such a release ineffective as to negligent actions unless the word negligence is expressly employed, excepting instances involving persons of vastly different bargaining powers such as employer and employee. I am in agreement with those jurisdictions which hold such a rule would, in many instances, have the practical effect of rendering such agreements virtually meaningless.
With regard to indemnity or hold harmless agreements, however, the majority rule is that such contracts are illegal unless performance of the tortious act is only an undesired possibility in the performance of the bargain which does not itself tend to induce the wrongful act.
It appears that, based on the aforesaid general principle, all jurisdictions recognize the validity of indemnity contracts in the field of automobile liability insurance. This rule is adhered to even in cases involving statutory violations. The weight of authority in indemnity cases is that one may stipulate to be relieved of his own future negligence. None have, however, gone so far as to say that such agreements may excuse a tort feasor from the effects of his own wilful or deliberate torts. In generally holding indemnity contracts valid, the courts have relied upon several principles. Some have equated such agreements to automobile liability policies, others upon the principle of freedom of contract, still others by merely concluding no violation of public policy is involved. It appears the majority are committed to the view that indemnity contracts are to be strictly construed and therefore will not relieve one of his own negligence unless the word negligence is expressly included. The majority rule apparently applied in our own courts in Buford v. Sewerage and Water Board of New Orleans, 175 So. 110, Ct. of App. Orleans (Fourth Circuit), may be stated as follows:
A contract of indemnity will not be deemed to relieve a person of the consequences of his own negligence where *917 such intent is not expressed in clear and unequivocal terms. In general, words alone do not indicate intent to hold an indemnitor liable for the negligent acts of his indemnitee and no inference resulting therefrom can establish such intent. Every presumption is against such intent and in the absence of express language to the contrary, the courts will not construe such an agreement as being intended to relieve indemnitee of his own negligence.
Hayes v. Hayes, 8 La.Ann. 468, a rather cryptic decision, in its entirety states:
"SLIDELL, J. The exception pleaded by the defendant and which was overruled by the Court below, involves the proposition that a man may lawfully agree with another to limit his responsibility in damages for a future offence against such person's good name. Such a doctrine is as inadmissible as it is novel. It is manifestly inconsistent with public policy that a man should be permitted to stipulate a partial impunity for the commission of a future immoral act.
Such being our opinion, it is unnecessary to inquire whether the motion to dismiss the appeal, upon the ground that the judgment was not final, was well made."
The syllabus of the Hayes case, supra, reads as follows:
"It is against public policy to permit a person to stipulate for a partial immunity for the commission of a future immoral act."
I interpret the Hayes case, supra, as holding merely that one may not contractually avoid liability for an immoral act or conduct involving moral turpitude. With this conclusion I concur considering immoral acts per se contravene public policy. In my view an immoral act is equated to a deliberate or wilful tort in that the conduct involved is intentionally and deliberately performed for the purpose of achieving a specifically desired end or the satisfaction of some personal urge, drive, motive, desire or result. I view Hayes, supra, therefore, as authority merely for the proposition that, in line with the majority view, one may not contract away liability for an act involving moral turpitude. This is not by any means the same as saying the case holds one may not be relieved of the consequence of an act of negligence involving no moral turpitude. I find, therefore, at most Hayes, supra, holds that one may not be relieved of liability for his deliberate or wilful torts which insofar as concerns indemnity agreements accords with the majority view.
In Sandel & Lastrapes v. City of Shreveport, 129 So.2d 620, Second Circuit, plaintiff sued for damages allegedly due to defendant's negligent failure to furnish certain material on schedule. In resisting the demand defendant relied on a contract provision which stipulated plaintiff would have no claim for damages resulting from delays in work progress caused by defendant or others. Defendant contended the provision exonerated it from liability even for delays resulting from its own negligence. Without citing any authority whatsoever, the court of appeal held such a provision void per se as being in contravention of public policy. In my humble judgment the conclusion reached is contrary to what I deem to be the law of this state as expressed in the decisions to date.
In Jennings v. Ralston Purina Company, 201 So.2d 168, the Second Circuit in effect reversed the position taken in the Sandel case, supra, although in Jennings, supra, a distinction was made. In the Jennings case, supra, plaintiff sued defendant Ralston and its insurer, Liberty Mutual Insurance Company, in tort for personal injuries sustained in a fall from the roof of a building belonging to Ralston. Plaintiff's employer, Efurd, and his compensation insurer, Aetna Insurance Company, intervened claiming compensation benefits and medical expense paid Jennings. Ralston *918 and Liberty third partied Efurd and Aetna. The trial court rejected plaintiff's demands. Plaintiff, third party plaintiffs and third party defendants appealed.
The facts in Jennings, supra, were that Ralston contracted with Efurd to construct a shed onto a building owned by Ralston. To accomplish the work, Efurd's employers had to go upon the roof of the building and the shed itself, both of which were covered with a material known as Transite. Said material became quite slippery when wet. On the morning of plaintiff's injury, Ralston's employees washed down the roof of the main building. Some of the water flowed down onto the shed roof where plaintiff was working. Plaintiff slipped and fell to the ground. Ralston's third party demand against Efurd and Aetna was based on a contract provision wherein Efurd agreed to hold Ralston harmless "from any loss, damage, liability and expense for all injuries, including death to persons or damages to property directly or indirectly arising or growing out of the performance of this contract * * *. Contractor shall hold Company harmless from and shall answer and defend any action instituted against Company for any loss, damage or injury sustained by any person resulting from the performance of this Contract."
In Jennings, supra, the court of appeal reversed the judgment of the trial court which rejected plaintiff's demand on a plea of contributory negligence. Judgment was rendered in favor of plaintiff and in favor of Ralston and Liberty on their third party demands. The court disposed of Efurd's and Aetna's contention that the hold harmless agreement involved was contra bonos mores insofar as it sought to relieve Ralston of its own negligence by finding such a clause does not violate public policy but, however, must be strictly construed. The court also held that notwithstanding the rule of strict construction, use of the words "any damage or injury arising out of the performance of this contract" could only mean all damages, including such as might occur from Ralston's own negligence. In finding the indemnity clause did not contravene public policy, the court held the Sandel case, supra, inapposite on the ground that Sandel involved a contractor and contractee and did not involve protection against tort liability to third persons. The court then held indemnity agreements were not per se contrary to public policy. The effect of the Jennings case, as I see it, is that indemnity agreements, as distinguished from anticipatory releases, are not void per se and while the rule of strict construction applies in such cases, use of the word "negligence" is not sacramental for such a provision to relieve one of the effects of his own culpable actions.
Forsyth v. Jefferson Downs, Inc., 152 So.2d 369, (Fourth Circuit), involved a claim for the value of a race horse killed while exercising on defendant's track under repair. Defendant plead contributory negligence on the part of the jockey and also a release in which plaintiff agreed "our horses are exercising or training on the race track at our own risk and that any injury to the exercise boy, jockey, or trainer or any injury to the horses will be at our own risk." The agreement further provided horses would not be exercised after 8:00 A.M. Notwithstanding the validity of the release was not at issue, the court nevertheless held such a release was not per se contra bonos mores. Upon finding plaintiff had violated the terms of the release by using the track after 8:00 A.M., plaintiff's claim was denied.
Arnold v. Stupp Corporation, 205 So.2d 797, the basis of the majority opinion herein, states in substance that Louisiana is committed to the majority view that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him from his own negligence where such intention is not expressed in unequivocal terms, and that words alone such as "any and all liability" do not indicate intent to impose an obligation so harsh as to render an indemnitor liable to an indemnitee for damages caused solely *919 by the negligence of the latter. This is, of course, but another way of saying one will not be relieved of the consequences of his own negligence unless the word "negligence" is specifically used.
Although the above conclusion was reached in the Arnold case, supra, after a most thorough and painstaking review of the jurisprudence, I believe the principle therein laid down does not accord with the tenor and import of the cases. While all decisions in our courts have expressly declared that such provisions are to be strictly construed, none prior to Arnold, supra, has expressly declared use of the word "negligence" to be an indispensable element. On the contrary, it appears to me that the import of the decisions is that the language and circumstances of each case will be considered in arriving at what the parties truly intended. Such a rule accords with the statutory provision of Louisiana Civil Code Article 1945 which states that legal agreements have the effect of law upon the parties and that courts are bound to give legal effect to all contracts according to the will of the parties which is determined by the words of the contract when they are clear and lead to no absurd consequence.
My views appear somewhat supported by the decision rendered on rehearing in Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166. Freeman, supra, involved a suit on a contract. In Freeman, supra, the word "negligence" was not employed by plaintiff in contending that defendant had breached his contractual obligations and was, therefore, liable to plaintiff for the consequences thereof. On rehearing the Supreme Court affirmed the ruling of this court which held that in view of the contractual provisions as a whole and the attending circumstances, defendant was relieved of liability for all delays, even those occasioned by defendant's own derelictions. I note that in the Freeman case, supra, the exculpatory clause relied upon by defendant did not expressly relieve defendant from delays due to its own "negligence".
In Elephant, Inc. v. Hartford Accident & Indemnity Co., La.App., 216 So.2d 837, this court recently considered an anticipatory release which did not specifically include the word "negligence". On rehearing the court held in effect that interpretation of the release clause depended upon the attending circumstances as revealing the intent of the parties. On this basis the case was remanded for the taking of additional testimony concerning the events incident to making the contract. The decision reached in Elephant, Inc., supra, in my view, is inconsistent with that pronounced by the court in Arnold v. Stupp Corporation. If, as the majority holds, use of the word "negligence" is sacramental in cases of this nature, why remand for the taking of testimony to show the intent of the parties in a cause wherein the indispensable word "negligence" was not employed? If failure to employ the sacramental language is fatal, then it matters not what the true intention may have been.
I am not unmindful of the rule that informed parties do not ordinarily bind themselves to unjust and unreasonable obligations. Oil Field Supply & Scrap M. Company v. Gifford Hill & Co., 204 La. 929, 16 So.2d 483. This principle, however, is but one facet of the rule of contractual interpretation which requires the courts to determine precisely what the parties intended by the language used and the pertinent attendant circumstances. It is my opinion that, in construing indemnity agreements and anticipatory releases, the question of whether a party was intended to be relieved of the effects of his own negligence is to be determined in the light of the language used and the surrounding circumstances and use of the word "negligence" is not sacramental or indispensable.
The servitude agreement in question was clearly not of the ordinary or usual variety. To commence, both parties thereto are large industrial corporations presumably represented by able counsel. At the time the agreement was made, defendant operated a huge chemical complex on the properties *920 through which plaintiff's lines were to pass. Obviously these lines, carrying gasoline, kerosene and similar products, posed a constant danger to defendant's facilities from fire and explosion should their contents escape while flowing through defendant's premises. It is conceded that plaintiff, a common carrier, could have expropriated the servitude desired. Unquestionably, had plaintiff expropriated the necessary easement, it could have done so without obligating itself to the terms of the now controversial release clause. I can only speculate as to the consideration plaintiff may have been called upon to pay had it instituted condemnation proceedings against defendant's successor in title. I feel justified, however, in assuming plaintiff weighed all aspects of the matter thoroughly before resorting to private negotiation in preference to expropriation. I also find that if either party possessed an advantage, it was plaintiff corporation which held the authority to expropriate. Notwithstanding this important consideration, plaintiff agreed to the provisions set forth in the majority opinion.
I conclude Solvay's reservation of use of subject property for itself and/or its tenants consistent with its present or future operations, coupled with the right to require plaintiff to move its lines upon notice and plaintiff's release of defendant from any loss or damage to the lines resulting from "any use" of said lands by defendant or defendant's tenants could only envision any and every use thereof, even a negligent use. To hold otherwise would, in my view, restrict the effect of the release clause to something less than what was obviously intended by the contracting parties.
I agree that certain articles of our Civil Code govern the effects of servitudes. For example, Article 771 states that when servitudes are established, all necessary elements thereof are granted. Article 772 provides that the owner of a servitude may make all works necessary to use and preserve it. Article 777 forbids the owner of the servient estate from doing any act which may diminish the servitude or make it more inconvenient. With the foregoing rules, I am in complete accord. I note, however, Civil Code Article 752 which expressly provides that any servitude may be altered by agreement of the parties concerned providing no public interest is adversely affected thereby. No such conflict of public interest has been shown in the case at hand.
In any event, the owner of the servient estate is not liable to the holder of a servitude across his lands for damage resulting to the property of the latter unless the loss occurs through the breach of an obligation or some act of negligence on the part of the landowner. Such being the case, the agreement in question must be held to encompass defendant's negligent use of its lands because in that event defendant would be liable to plaintiff. It subject release does not include acts of negligence, I deem it virtually meaningless under the circumstances. It is settled law that contracts are presumed to have some meaning. Gautreaux v. Harang (1938), 190 La. 1060, 183 So. 349.
As hereinabove shown, the authorities are unanimous in the view that one may not be contractually relieved of the effects of either an immoral act or one's deliberate or wilful negligence. With this principle I am in complete agreement. The majority opinion did not reach the question whether one may be relieved of the effects of his "gross negligence" as distinguished from "ordinary negligence". Such a determination appears unnecessary in view of the majority finding that the agreement did not absolve defendant from the effects of any negligence whatsoever.
Plaintiff contended in the alternative that if the agreement is to be interpreted as defendant argues, then defendant herein was guilty of gross negligence which is the equivalent of a deliberate or wilful act and public policy forbids the release of a claim based on an act of this nature. I find it unnecessary to determine this latter issue because, in my view, defendant was guilty only of ordinary negligence.
*921 Defendant's engineer, Charles Z. Breaux, testified in essence that because of slides which occurred in 1953 and 1957, a subsoil analysis of the area was made which showed the ground in question could support a load or weight of 1500 pounds per square foot "as being a safe load, very safe, in fact, this of course would have a safety factor of about two." According to Breaux, this meant the pisolites could be safely stacked to a height of approximately 14 feet. Breaux further stated he was aware of the possibility of slides and, being in charge of the operation, saw that the material was kept away from plaintiff's servitude. In this respect, Breaux stated that whereas it was considered the substance could be safely stacked within 50 feet of plaintiff's right of way, as an added precaution, the material was in fact deposited no nearer than 100 feet therefrom. In addition, Breaux stated the tests showed the material could be safely stacked within 50 feet of the bayou but that as a safety measure, it was not deposited that close. Breaux further stated that he made frequent trips to the area and observed that the heaping, at its apex, was considerably more than 14 feet and sloped gradually to ground level on all sides. According to Breaux, the reports indicated that, in all probability, if a slide occurred, it would happen to the east of plaintiff's lines and plug Monte Sano Bayou but would not affect plaintiff's lines which lay downstream to the west.
From the foregoing, I cannot stigmatize defendant with gross negligence which implies a "callous disregard for one's action." While defendant was negligent under the circumstances, nevertheless defendant's actions were not undertaken with unreasonable disregard for the probable consequences thereof.
I respectfully dissent.
Rehearing denied.
LANDRY, J., dissents from the refusal to grant a rehearing.