MARBURY–PATTILLO CONSTRUC-
TION COMPANY, INC., Plaintiff-
Appellee,

v.

BAYSIDE WAREHOUSE COMPANY, De-
fendant-Third Party Plaintiff-
Appellant.

v.

The AETNA CASUALTY AND SURETY
COMPANY, Third Party Defendant-
Fourth Party Plaintiff-Appellee,

v.

D. H. MARBURY, III, and A. F. Pattil-
lo, et al., Fourth Party Defendants.

No. 72–1863.

United States Court of Appeals,
Fifth Circuit.

Feb. 25, 1974.

Carl J. Schumacher, Jr., Earl S. Eichin, Jr., New Orleans, La., L. Vastine Stabler, Jr., Birmingham, Ala., for defendant-third party plaintiff-appellant.

W. S. Pritchard, Jr., Birmingham, Ala., for Marbury-Pattillo.

James E. Clark, Birmingham, Ala., for Aetna Cas. & Sur. Co.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

After a thirteen day jury trial, this warmly contested diversity litigation resulted in a judgment for $60,000 in favor of Marbury-Pattillo Construction Company, Inc., [Marbury] against Bayside Warehouse Company, Inc., [Bayside] as the balance due and unpaid for the construction of four steel 500,000 bushel capacity grain storage tanks on the Mississippi River at Reserve, Louisiana. Although strongly urged to the contrary, we detect no reversible error in the proceedings below. The judgment of the District Court will, in all respects, be affirmed.

The agreed price for the work was $1,185,000. It is undisputed that of this amount Bayside withheld the payment of $60,000. The basic issue was whether this action had legal justification. This necessitates, first, an outline of the facts, stated in the light most favorable to the jury verdict, Hanover Fire Insurance Company v. Sides, 5 Cir., 1963, 320 F.2d 437; Gulf Oil Corporation v. Griffith, 5 Cir., 1964, 330 F.2d 729.

Prior to the commencement of the construction in question, Marbury had completed work at the same location on a much larger concrete grain storage facility for the South Louisiana Port Commission. That facility had been leased to Bayside, as operator. In June, 1968, Bayside decided to construct additional grain storage tanks. No final designs, plans, or specifications were in existence but the desired tank capacities were known, which, in turn, indicated the needed diameter and depth of the tanks. The real problem was that they were to be constructed on the unstable soil immediately adjacent to the Mississippi River, something the parties knew plenty about from the recently completed construction of the concrete grain storage tank facilities. In any event, using a *fully pile supported* construction approach, bids were solicited by telephone from five firms. Marbury submitted a bid of $1,800,000. This was rejected as too costly.

In the meantime, Bayside had obtained two subsoil investigation reports, one from Gore Engineering Company (June 14, 1968) and the other from Eustis Engineering Company (July 25, 1968). These reports indicated that borings encountered ground water only four feet from the surface. Both reports clearly stated that in the absence of full piling support there would be settlement in the storage tank floors—the only question being how much and how soon it would occur.

Armed with this report, Bayside determined to proceed with construction of a type which would only be partially pile supported. The Gore and Eustis reports were passed on to Marbury and that organization was asked to reduce its former bid price by furnishing design drawings for a facility of the desired type.

On August 6, 1968, Marbury submitted to Bayside a letter proposal, accompanied by specifications and outline drawings, for the design and construction of a facility which would have piling only under the tunnels and beneath the concrete ring girders of the storage tanks, at a cost of $1,185,000. On August 9 Bayside accepted the proposal by letter. This letter began with the statement,

"This will authorize you to proceed with the work covered by your proposal dated August 6, 1968, for the design and construction of four (4) 500,000 bushel capacity steel grain storage tanks with related equipment as stated therein. . . . A formal contract and confirmation of the work will be executed at the earliest possible date." Work began immediately.

Some two or three months elapsed before Bayside's attorneys drafted the "formal" contract mentioned in the letter of acceptance. It was backdated to August 9, Bayside signed it in Memphis, and Marbury signed it in Birmingham. By that time, the piling under the tunnels and ring girders had been driven, the excavation done, and 65% of the concrete work completed.

On December 21, 1970, after this litigation was begun, but nearly two years before the trial thereof, Bayside sold the Marbury-constructed facilities to the South Louisiana Port Commission for $1,940,400. The sale to the Port Commission was based on a professional appraisal which, taking the tank floors into consideration, had fixed the value of the facilities at $2,135,140 as of the time the last of the four tanks were completed.

As the soil tests predicted, there was settlement in that portion of the steel tank bottoms rested on soil not supported by piling. This caused Bayside to withhold payment of $60,000 of the contract price. Marbury brought suit for the money and gained the jury verdict. Bayside brings the appeal.

The amended complaint, seeking recovery of $60,000,000, was met with a motion for change of venue from the Northern District of Alabama to the Eastern District of Louisiana, New Orleans Division, pursuant to 28 U.S.C. § 1404(a).[1] When this motion was overruled, Bayside answered and counterclaimed for the sum of $160,500 liqui- dated damages for failure to complete the tanks by the stipulated contract dates, plus $71,445.90 as the alleged cost of placing the tanks and related facilities in satisfactory condition in accordance with the contract specifications. Bayside also filed a third-party complaint against Aetna Casualty and Surety Company, the surety on Marbury's construction contract. Both claims were to be credited with the $60,000 withheld from Marbury. Marbury answered the counterclaim and Aetna answered the third-party complaint. On June 23, 1971, there was a pretrial hearing, at which the issues were identified.

After this pretrial hearing, and although Bayside had already sold the tanks for a sum 60% in excess of the original contract price, it filed, on July 8, 1971, an amended counterclaim and third-party complaint, demanding recovery in the sum of $1,235,000 as the cost necessary to "place the said tanks and related facilities in satisfactory condition in accordance with Marbury-Pattillo contractual undertaking". Therefore, the demand against the contractor and its surety was increased to $1,342,208.-19, plus interest and cost, subject to credit in the amount of $60,000.

Aetna then filed a fourth-party complaint against D. H. Marbury and others for indemnity under its surety agreement.

In this rather complicated posture the case went to trial before a jury, producing a transcript of 2,447 pages and the result already indicated.

It may be said, with little pause, that the jury verdict finds ample support in the evidence. The only thing for us to determine is whether the verdict was infected by reversible error in the conduct of the trial. We proceed to an evaluation of Bayside's assignments of error.

■ First, it is argued that the District Court erred in the denial of the motion for a change of venue. To pre-

1. 28 U.S.C. § 1404(a).
   For the convenience of parties and witnesses, in the interst of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

vail on this argument, Bayside must show that the action of the District Court amounted to an abuse of discretion, Nowell v. Dick, 5 Cir., 1969, 413 F.2d 1204; Garner v. Wolfinberger, 5 Cir., 1970, 433 F.2d 117.

■ The motion was supported by one affidavit which identified nine witnesses, including experts, Louisiana residents, as having material knowledge concerning the design and construction of the tanks which were the subject of the contract in controversy. Marbury's counter-affidavit set out the substance of the testimony expected of seven identified individuals within reach of subpoenas issued in the district where the suit was filed. The motion and the response raised only an issue as to whether nine witnesses should travel from New Orleans to Birmingham or seven witnesses should travel the route in reverse. This fails of a substantial question as to an abuse of judicial discretion in the denial of the motion.

■ Bayside relies, however, on Koehring Company v. Hyde Construction Company, 5 Cir., 1964, 324 F.2d 295, reversing the denial of a change of venue in a suit by a Mississippi company against a Wisconsin corporation concerning the allegedly defective construction of a concrete plant and cooling facilities on the Arkansas River in the State of Oklahoma. We do not consider *Koehring* apposite, however, for the reason that one of the chief factors there was the distinctly possible necessity of an on-site inspection of the construction. In its motion, however, Bayside was content to say only that "it may be invaluable for the jury to make a physical inspection", not that it would, in fact, be necessary to the ends of justice, with the supporting reasons assigned. After all, Marbury admitted that the soil had receded and the unsupported tank floors had sunk, contending, however, that the condition had all along been within the contemplation of the parties. It was hardly likely that the jury would need to look at a condition, the existence of which was admitted.

In Gulf Oil Corp. v. Gilbert, 1947, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055, the Supreme Court elucidated upon the factors justifying a Section 1404(a) change of venue, but it was careful to point out that "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum shall rarely be disturbed", 330 U.S. at 508. Our analysis of Bayside's motion is that it hardly balanced at all, much less raised "a strong balance" in its behalf. Consequently, we hold that the denial of the requested transfer of the litigation from Birmingham to New Orleans is not to be disturbed.

■ The appellant, Bayside, next complains of the admission of certain testimony which it says should have been excluded in compliance with the parol evidence rule generally applicable to contracts made in writing.

We consider this contention against the following background. First, there was a letter contract as of August 8, 1969. Work began the next day. It was nearly three months before the "formal" contract was signed. In the meantime, as already recited at the beginning of this opinion, the specified piling had been driven and the concrete work 75% completed. These were the items most essentially connected to hopes of avoiding floor settling. They were the essential elements of the "fall back", ring girder construction to which Bayside had resorted in order to reduce the cost that would have been involved in a totally pile supported facility.

In any event, the "formal" contract contained the usual "parol evidence" stipulation:

> "The contract is the entire agreement between Owner and Contractor and there are no other representations or warranties. This contract may be amended or modified only in writing and any such written amendments shall be executed and signed by duly authorized representatives of both Owner and Contractor."

*   *   *   *   *   *

"The Contract embodies the entire agreement between the parties. There are no terms, conditions, obligations or promises relating to the subject matter, other than those contained in the Contract Documents."

Bayside argues that under the parol evidence rule these contract provisions should be "given conclusive effect"; that the November instrument "constituted the best and only admissible evidence of the agreement between Bayside and Marbury-Pattillo related to the construction of the grain facilities which are the subject of this litigation".

The origin, history, function, and purpose of the parol evidence rule add up to a well-defined area of jurisprudence. We do not consider it necessary to indulge ourselves at this point in an interesting re-examination of the field. We are content to say that in the present posture of this case we cannot agree with Bayside's position.

We begin with the proposition that both the letter contract and the "formal" contract required Bayside to pay the $60,000 here in issue unless Bayside could legally justify a refusal to do so. Bayside attempted to establish that justification by taking the position that the "formal" contract placed responsibility for both the design and the construction of the facility on Marbury, that the facility thus designed and constructed had to satisfactorily perform the functions for which it was built, and that because of Marbury's defective design Bayside had failed to receive that which it had agreed to pay for.

Marbury resisted this attack with the argument that regardless of the formal recitations of the contract, Bayside from the outset had limited the project design to one within the concept of pile supported ring beams and cross tunnels, with unsupported floor quadrants resting on the soil, all as a deliberate substitution for a more certain but more costly approach.

Unless the parol evidence rule demands its exclusion, Marbury's proof in this regard is well nigh undisputed, including the undenied proof that Bayside's manager all along stated that he "could live with" as much as nine inches of settlement in the unsupported floor quadrants. Undoubtedly, Bayside deliberately retreated to the ring and tunnel approach solely as a matter of reducing costs. It asked for bids, using that approach. It had the line drawings in its possession when it accepted Marbury's bid. It directed that work begin forthwith. It allowed much of the critical aspects of the work to be completed before its lawyers completed the drafting of the "formal" contract, and then had that instrument backdated to the next day following the letter acceptance.

A wooden, purely mechanical, application of the parol evidence rule to this factual situation could convert the rule into a shield for fraud, an intolerable result, Hinds v. Plantation Pipe Line Company, 5 Cir., 1972, 455 F.2d 902; Restatement, Contracts, § 238(b) (1932).

We need not ground our decision on this factor, however, for we feel that this was exactly the kind of parol evidence situation in which a jury ought to be told, as it was here, that it must look first to the actual wording of the contract, but was also permitted to consider the facts and surrounding circumstances, not to vary the terms but in order more certainly to determine the intention of the parties as reflected by the words used.

In this regard, see, *inter alia* Hunter-Benn & Company v. Bassett Lumber Company, 224 Ala. 215, 139 So. 348 (1932); Frasch v. City of Prichard, 224 Ala. 410, 140 So. 394 (1932); Conway v. Andrews, 286 Ala. 28, 236 So.2d 687 (1970); Admiral Paint Company v. Goltzman (La.App., 1971), 254 So.2d 104, writ refused, 260 La. 289, 255 So.2d 772; Plantation Pipe Line Company v. Kaiser Aluminum & Chemical (La.App., 1969), 222 So.2d 905; Provident Life and Accident Insurance Company v.

Pressley (1953), 37 Ala.App. 153, 64 So.2d 618; Wilkins v. Reliance Equipment Company, 259 Ala. 348, 67 So.2d 16 (1953); Cole v. Yearwood, 241 Ala. 437, 3 So.2d 1 (1941); Muse v. Metropolitan Life Insurance Company, 193 La. 605, 192 So. 73, 125 A.L.R. 1075 (1939); Kuhn v. Stan A. Plauche Real Estate Company, 249 La. 85, 185 So.2d 210 (1966); Obermark v. Clark, 216 Ala. 564, 114 So. 135; Southern Metal Treating Company v. Goodner, 271 Ala. 510, 125 So.2d 268.

■ The next assignment of error insists that the District Judge should have declared a mistrial instead of continuing with a jury of eleven after one of the twelve had engaged in a courthouse conversation with a corporate officer of Marbury-Pattillo. After about four days of evidence Mr. Pattillo encountered one of the jurors in a corridor near the courtroom, upon which both men talked in a friendly fashion about numerous subjects, finally getting around to some which were relevant to the trial. The conversation was decidedly enough to require that the juror not be permitted to continue, United States v. Harry Barfield Company, Inc., 5 Cir., 1966, 359 F.2d 120. After a full hearing he was relieved of further duty. Bayside insisted below and insists here that rather than completing the trial with eleven jurors the Court should have declared a mistrial. The basis for this argument is that under the circumstances Bayside had not stipulated to a jury of less than twelve.

When the trial began on April 11, 1972, the following took place.

"THE COURT: Are the parties agreeable to continuing the trial with less than 12 jurors in the event one is absent or disabled, or will it be necessary to select alternates?

"MR. STABLER: When you say continue it with less, do you mean with one less?

"THE COURT: Down to ten, I would think, as a practical matter.

"MR. STABLER: That is agreeable with me.

"MR. PRITCHARD: I have no objection.

"MR. CLARK: I don't object."

Appellant now says that the words, "absent or disabled" in the foregoing stipulation should not be read to encompass a situation which arose as result of the voluntary actions of an officer of a party to the litigation, that the stipulation was not intended to include an "absence or disability" so caused. Quoting further from appellant's brief: "Because Mr. Pattillo initiated conversations with jurors which interfered with the trial process by altering the jury as selected, a mistrial was the only proper safeguard of the integrity of the jury system".

We are of the opinion that this argument ought not to prevail. The word "disabled" in the stipulation was not qualified by the word "physically" or any other limiting term. The fair and reasonable meaning of the stipulation was that if, *for any reason*, a juror was unable to complete the trial the parties would proceed, at least as long as the number of jurors did not fall below ten.

Of course, under existing rules, the trial very likely would have begun with only six jurors. The unanimous verdict in this case was returned by eleven.

The other assignments of error on behalf of Bayside have been duly considered and found not to justify reversal. We do not reach, nor do we decide, anything with reference to the surety on the performance bond. The verdict for the principal exonerated the surety and nothing further need be considered.

The judgment of the District Court is in all respects

Affirmed.